**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN S. MALOZIENC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05 C 7001** |
| | ) | |
| **PACIFIC RAIL SERVICES,** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John S. Malozienc ("Plaintiff"), a current employee of Defendant Pacific Rail Services ("Defendant"), brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* Plaintiff alleges in a two-count First Amended Complaint that Defendant discriminated against him on the basis of his race (white) and in retaliation for filing a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR"). The case is now before the Court on Defendant's motion for summary judgment on the merits as well as on Defendant's supplemental motion for summary judgment on the issue of whether Plaintiff's complaint was timely filed. The Court held oral argument on January 21, 2009 regarding Defendant's motion for summary judgment on the merits. At that time, Defendant informed the Court of a document Defendant received as part of additional discovery following this Court's August 19, 2008 denial of Defendant's motion for summary judgment on the issue of timeliness. Dkt. 73, 100. This new document was not available when the parties briefed and the Court ruled upon the timeliness issue. The Court will address the timeliness issue in light of this document below. For the following reasons, Defendant's motion for summary judgment on the merits is granted in part and denied in

part; and Defendant's supplemental motion for summary judgment on the timeliness issue is denied.

## I. BACKGROUND FACTS

The following facts regarding the merits of Plaintiff's suit are undisputed or presented in the light most favorable to the Plaintiff when contested. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). This Court examines the parties' submissions in accordance with the applicable Federal Rules of Civil Procedure, Federal Rules of Evidence and Local Rules.

## A.    Defendant's Business and the Union Positions Available to Plaintiff

Defendant is an intermodal contractor retained by railroads to load and unload large containers on and off rail cars. DS ¶ 1.[1] Plaintiff is currently employed as an operator at Defendant's facility in Willow Springs, Illinois ("the facility"). *Id.* at ¶ 2. Plaintiff is a member of Local 705 of the International Brotherhood of Teamsters ("Local 705"), which began representing the non-supervisory yard employees on January 1, 2002. *Id.* at ¶¶ 2-3. As an operator, Plaintiff's primary job function is to operate one of two heavy machines—the taylor (or "sideloader") and the overhead crane (or "lift"). *Id.* at ¶ 4; Pl. Ex. 3. Although Plaintiff typically operates either machine, Defendant assigns Plaintiff and its other union

---

[1] Citations to the record are in the following form: Defendant's Local Rule 56.1(a)(3) Statement of Material Facts is cited as DS ¶__; Defendant's Attachments to its Local Rule 56.1(3) Statement of Material Facts is cited as Def. Att.__; Plaintiff's Exhibits and Appendix of Cases in Support of His Response to Defendant's Motion for Summary Judgment is cited as Pl. Ex.__; Plaintiff's Local Rule 56.1(b)(3) Response to Defendant's Statement of Material Facts is cited as PR ¶__; Plaintiff's Local Rule 56.1(b)(3)(6) Statement of Additional Facts is cited as PSAF ¶__; Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1(A)(3) Statement of Material Facts is cited as DR ¶__; Defendant's Reply to Plaintiff's Statement of Additional Facts is cited as DRPSAF ¶ __; Defendant's Memorandum of Law in Support of its Motion for Summary Judgment is cited as DSSJ__: Defendant's Attachments to Its Reply Brief in Support of its Motion for Summary Judgment is cited as DA ¶__; Plaintiff's Response to Defendant's Motion for Summary Judgment is cited as Pl. Resp.__; Defendant's Reply Brief is cited as Def. Rep.__; Materials Omitted from Plaintiff's Response To Defendant's Statement of Material Facts is cited as MOPR, Ex. ___; Materials Omitted from Plaintiff's Statement of Additional Material Facts is cited as MOPSAF, Ex. ___; and Materials Omitted from Defendant's Local Rule 56.1(a)(3) Statement of Material Facts is cited as MODS, Ex. ___. Dkt. ___ represents docket entries in this case.

employees to various other jobs, depending on its needs on a given day. DS ¶ 5.

The collective bargaining agreement ("CBA") that governs Plaintiff's employment divides the union positions into three positions: (1) groundman; (2) hostler (truck) driver or spotter; and (3) operator. *Id.* at ¶ 6. The operator position is divided into three subcategories—taylor operators, crane operators and operators who are certified to operate both machines. *Id.* at ¶ 7. At the facility, the Terminal Manager ("TM") is the highest ranking on-site employee, followed by Assistant Terminal Managers ("ATM"). *Id.* at ¶ 11. Individuals in those two positions, as well as the Vice President of Human Resources, the Vice President of Operations and the Assistant Vice President of Operations are responsible for interpretation and administration of the CBAs. *Id.* at ¶ 12.

An employee who is certified to operate one or both of the machines receives a corresponding wage increase irrespective of whether the employee actually operated either machine on a given day. *Id.* at ¶ 10. From the time Plaintiff was hired in March 2001 until February 2005, employees certified to operate either the taylor or the crane—or both —received an extra $1.00 per hour in addition to their regular hourly wage rate. *Id.* at ¶ 8. In February 2005, this incentive was increased to $1.50 per hour if the employee could operate one of the two machines and to $3.00 per hour if the employee could operate both machines. *Id.* at ¶ 9.

## B.    Defendant's Knowledge of Legal Obligations

Defendant has a complaint procedure and a harassment policy. DR ¶¶ 1-2. It is disputed whether they were ever used with respect to Plaintiff's IDHR-related complaints. DR ¶¶ 1-2. The CBA contains a grievance procedure as well as non-discrimination and equal employment policies. PSAF ¶¶ 1-2; Pl. Ex. G at Nos. 6-9; Pl. Ex. K at p. 29-32, Articles 17 and 27, § 6. The CBAs do not address the prohibition of retaliation based on an employee's

complaints of racial discrimination or harassment. PSAF ¶ 3; Pl. Ex. G at No. 15.

## C.    Defendant's Training and Certification Process for Operators

The evidence regarding Defendant's training and certification process is in dispute. Plaintiff presents evidence that from 2001 until 2004, Defendant had a formal training and certification practice for the taylor and crane because Defendant posted training sign-up sheets and conducted training based on seniority.  PR ¶¶ 13, 20.  To be certified, employees were required to train for at least eighty hours per machine.  *Id.*  Defendant denies such a formal process existed, asserting that from 2001 until it began posting sign-up lists in 2004, employees were expected to initiate the training and certification process by asking to observe an operator's work and operating the machine under an operator's supervision.  DS ¶¶ 13-15, 20.

Defendant presents evidence that since 2004, it has relied upon all of the following factors when deciding whom to train: whether an employee signed up for training, seniority, attendance, work performance, training history, desire and teamwork. DS ¶¶ 21-22. Plaintiff, on the other hand, presents evidence that employees who sign up for training are required to receive it in seniority order.  PR ¶ 21; Def Att. 13 (regarding 2006); Pl.  Ex.  B at ¶¶ 5-8 (regarding 2001 through 2003); Pl. Ex. D at 31-32 (no date); Pl. Ex. I (September 2003); Pl. Ex.  J (May 2005); Pl.  Ex. K, Art.  6 and 15; Pl.  Ex.  L (July 2004); Pl. Ex. M (February 2005); MOPR, Ex. B. To this end, Article 15 of the CBA provides: "Employee seniority, and not the equipment, shall prevail for all purposes and in all instances except promotions." Pl. Ex. K. Defendant contends training and certification occur only when a business need exists, while Plaintiff alleges certain employees were trained at any time, upon request.  DR ¶ 16; PR ¶ 16.  Plaintiff alleges he was required to undergo a lengthier training schedule of 440 hours.  PR ¶ 15.  Defendant contends training requires a minimum of several months, but it

can take years because staffing needs, workload, operator availability, and work schedules can cause significant breaks in training. *Id.*[2]

Whether seniority is the determinative factor with respect to training under the CBAs is disputed. DR ¶¶ 30-31. Three CBAs have been in effect since Plaintiff was hired.[3] DS ¶ 29. Defendant contends the relevant CBAs did not require it to administer training on any equipment, including the taylor and the crane, in seniority order. DS ¶ 30. It further asserts employees responsible for interpreting and administering these CBAs have never required Defendant to train employees in seniority order. *Id.* Defendant contends seniority has never been the sole determinant governing training and certification during Plaintiff's employment, urging it has retained sole discretion over whom to train. *Id.* at ¶ 31. As discussed above, Plaintiff presents evidence that the CBA effective from January 1, 2002 through December 31, 2005 indicates seniority is the determinative factor. PR ¶¶ 21, 30; Pl. Ex. K, Art. 6 & 15; Def Att. 13; Pl. Ex. D at 31-32; Pl. Ex. I; Pl. Ex. M; MOPR, Ex. B.

Defendant states that, from 2001 to 2004, when a supervisor deemed an employee capable of operating the crane or taylor, the supervisor certified the employee as a crane or taylor operator, and the employee received a corresponding permanent wage increase. DR ¶ 17. While Plaintiff denies this, it is reasonable to infer an evaluation of the employee's skills was a prerequisite to certification. *See* Pl. Ex. I. Three to four supervisors worked on Plaintiff's shift throughout his employment. PR ¶ 18. It is undisputed that both African-American and Caucasian supervisors shared Plaintiff's shift and were able to certify

---

[2]While Plaintiff presents evidence that two employees were certified within several weeks, this is inadmissible hearsay.

[3]The first was in effect from August 11, 1998 to August 10, 2001 and expired but remained in effect until December 31, 2001; the second was in effect from January 1, 2002 to December 31, 2005; and the third agreement was in effect from January 1, 2006 to March 31, 2008. DS ¶ 29.

employees.  DR ¶ 18. Defendant contends that since 2005, employees training on either machine have signed a sheet with the date, number of hours trained, and signatures of the trainer, ATM and TM.  DR ¶ 23.

**D.  Plaintiff's Training and Certification on the Taylor and the Crane**

Plaintiff was hired in March 2001 as a groundman and spotter, at which time he received the contract wage rate for those positions. DS  ¶ 25.  Plaintiff has worked the third shift. PSAF ¶ 35. In or about October 2002, Plaintiff complained through his union that Defendant violated the seniority provisions of the CBA when it certified Coy Hardiman ("Hardiman') in the taylor.  DR ¶  26, 32.  Hardiman was hired on September 30, 1998; resigned on February 2, 2000; and was rehired on August 22, 2001. DS  at ¶¶ 27-28.  He was certified on the crane on September 13, 1999, during his first period of employment, nearly a year and a half before Plaintiff was hired. DRPSAF ¶ 9; DS  ¶ 8.

Although Plaintiff was not actually certified or qualified to operate either the taylor or the crane, Defendant gave Plaintiff and his African-American coworker, Nate Pates ("Pates"), the contractual $1.00 per hour wage increase in October 2002 as if they were in fact so certified. *Id.*  at ¶¶ 32, 77.  This wage increase represents the increase Plaintiff would have received had he actually been certified to operate either or both of the machines.  *Id.* at ¶ 33.  Plaintiff and Pates are the only employees at the facility who have ever received this wage increase without first being certified to operate the taylor or crane.  *Id.*  at ¶ 34.  As a result of this increase, in October 2002, Plaintiff received the maximum wage allowed under the CBAs.  *Id.*

### 1. Taylor

Plaintiff was certified to operate the taylor on or about February 7, 2005. *Id.* at ¶ 34. In March 2005, Defendant increased the wage incentive from $1.00 to $1.50 per hour per machine and gave Plaintiff an additional $.50 per hour increase to bring his total incentive to $1.50 per hour. *Id.* at ¶ 36. Plaintiff was certified on the taylor before four of his non-Caucasian coworkers: Ricky Brown (an African-American certified on April 22, 2005); John Lopez (an Hispanic certified on March 28, 2005); Reidus Hands (an African-American certified on October 10, 2005); and Pates (an African-American certified on August 8, 2005). DS ¶ 78. Plaintiff contends Defendant's records show Pates was never certified on the taylor. PR ¶ 78. He also claims Pates is certified, but such documents are not in his personnel file. PR ¶ 23.

Plaintiff further asserts Victor Trout ("Trout") "was never forced to be certified on the taylor." PR ¶ 78. Whether the taylor is a less desirable machine to operate or on which to train is disputed. PSAF ¶ 5. Defendant contends this represents Plaintiff's subjective belief. DRPSAF ¶ 5. Plaintiff claims the taylor is less desirable because only one of the machines has air conditioning and the large lights on all of the machines attract bugs. PSAF ¶ 5. Whether Plaintiff was forced to train on the taylor, but Pates, Trout and Anthony Hodge ("Hodge") were not is disputed. DRPSAF ¶ 7. Defendant admits Plaintiff is certified to operate the taylor, but Trout and Hodge are not. *Id.* However, Defendant contends no employee, including Plaintiff, was ever forced to train on the taylor, citing evidence Plaintiff complained to his union because he thought it was unfair Defendant had not trained him on the taylor. *See* DRPSAF ¶ 7; Pl. Ex. A at 24-25; PR ¶ 26. Defendant also presents evidence it has never trained and certified Trout on the taylor despite Trout's requests. See DS ¶ 52. In addition, Defendant contends Plaintiff voluntarily chose to train and become certified on

the taylor. DRPSAF ¶ 7; Pl. Ex. A at 34-36. While Plaintiff contends no non-Caucasian third shift employees operated the taylor, he presents only inadmissible evidence to support this assertion. PSAF ¶ 8.

### 2. Crane

Plaintiff claims he signed up to receive training on the crane in 2001, 2002, and in March 2004. PR ¶ 13; PSAF ¶ 24. It is reasonable to infer Defendant was aware Plaintiff signed up for such training in March 2004. *See* Pl. Ex. G at No. 3. From approximately June until October 2005, Plaintiff began crane training. DR ¶ 37. The parties dispute the reason why his training stopped in October 2005. *Id.* While Defendant contends it was entering its very busy holiday season, Plaintiff presents evidence that his training did not resume until November 2006. *Id.* at ¶¶ 37-38. Plaintiff was certified on the crane on November 27, 2006, and he immediately received the corresponding $1.50 per hour wage increase. *Id.* at ¶¶ 37-39. Plaintiff alleges had he been timely certified, he would have received the raise sooner. PR ¶ 39. Plaintiff also believes if he had been properly trained, certified and allowed to operate the machinery—as opposed to merely being paid for doing so—he would have earned his coworkers' respect. PSAF ¶ 32. Specifically, Plaintiff believes his coworkers would not have ridiculed or humiliated him because he observed they were upset he was paid for work he could not and did not perform. *Id.*

Plaintiff is the only employee on his or any shift who was certified on the crane since late 2003. DR ¶ 45.[4] Plaintiff was also the only employee who was trained and certified on the crane in 2006. *Id.* at ¶ 42.[5] Fourteen employees signed up for crane training in January

---

[4] Plaintiff presents only inadmissible evidence that other employees were certified on the crane since late 2003. *See* PR ¶ 45 and Pl. Ex. B at ¶¶ 11-12.

[5] While Plaintiff denies this, he fails to present evidence to support his denial because he admitted during his deposition that he did not know whether anyone else was trained on the crane in 2006. *See* Pl. Ex.

2006, six of whom were more senior than Plaintiff; eleven of whom are non-white; and none of whom had filed a charge of discrimination against Defendant with the IDHR or the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶¶ 40, 41, 44. Plaintiff did not sign his name to the January 2006 sign-up sheet. *Id.* at ¶ 43. Although Pates was trained on the crane before Plaintiff, Pates is senior to him. *See* DRPSAF ¶ 6; Pl. Ex. G at Doc. JHP0063. Plaintiff presents evidence the crane is a more desirable machine than the taylor, but Defendant contends this is Plaintiff's subjective belief. PSAF ¶ 6; DRPSAF ¶ 6.

### E. Victor Trout's Training and Certification on the Crane

The evidence shows Trout and Richard Hamm are the only African-American employees who are comparables for purposes of analyzing the training, certification and work assignment components of Plaintiff's race discrimination claim. Trout and Hamm are junior to Plaintiff while all other employees referenced by name are senior to Plaintiff. *See* Pl. Ex. G, at DHR 0012-13. Plaintiff does not point to Hamm as receiving favorable treatment; thus, the Court will focus solely on Trout when analyzing similarly situated employees' experiences with training, certification and work assignments. It is disputed whether Trout is the only African-American employee whom Plaintiff can identify by name as a comparable. DR ¶ 46. Initially, Plaintiff testified he did not remember the names of the other African-American employees over whom he has seniority, but he later named five African-American employees on his shift: Victor Trout (over whom Plaintiff has seniority), Al Steward, Pates, Titus Simons, and Hodge. PR ¶ 46; Pl. Ex. A, at pp. 164, 167-68.

---

A at 58. (Q. "Just so I'm clear, you don't know whether or not anybody, other than you, in 2006 was trained on the crane?" A. "Yes." Q. "That's correct?" A. "That is correct." Q. "Would it surprise you to learn that you were, in fact, the only person?" A. "Yes.").

Steward, Pates, Simons and Hodge are senior to Plaintiff.[6]  *See* Pl. Ex. G, at DHR 0012-13. Plaintiff presents evidence that he and those five individuals, along with Hardiman, Robert Master, and Hamm, worked the same shift, reported to the same supervisors, and held the same position with the same responsibilities. PR ¶ 46.

Despite having less seniority than Plaintiff, Trout was trained on the crane before Plaintiff was so trained.  DRPSAF ¶ 9.  Defendant presents evidence that Plaintiff received the wage increase associated with crane certification on October 7, 2002, before Trout received his increase.  DS ¶¶ 50-51; Pl. Ex. A at 24-29, 45-46.  Defendant contends Trout was hired in October 2001 as a groundman and, shortly thereafter, he asked operator Hodge to train him on the crane.  DS ¶ 47. Defendant alleges Hodge agreed to train Trout at Trout's request; over the next one to two years, Trout observed Hodge operate the crane and practiced operating it himself.  *Id.* at ¶ 48.

Plaintiff alleges Trout was allowed to work in the crane when he should have been working on the ground.  PR ¶ 48; Pl. Ex. A., at pp. 71-72.  The significance of Trout's training is disputed.  DR ¶ 48.  Plaintiff contends Trout's training shows Defendant acted in a discriminatory manner by bypassing its practice and later stated procedure of performing crane and taylor training on a seniority basis by allowing African-Americans to be trained with a simple request.  PR ¶ 48.  Defendant underscores Plaintiff's admission that he did not sign the sign-up list in 2006 and was trained ahead of six employees who had greater seniority.  DR ¶ 48. The Court notes Plaintiff signed up in 2004 and also claims he signed up in 2001 and 2002.

Defendant alleges Trout felt comfortable operating the crane by himself in November 2003 and asked a supervisor to consider him for certification.  DS ¶ 49.  That supervisor

---

[6]It is undisputed that approximately twenty-one employees of various races have never filed an IDHR or EEOC charge of discrimination against Defendant.  DR ¶ 76-77.  The accuracy of the list of the races of employees is also undisputed.  DR ¶ 77.

agreed and, after he observed Trout operate the crane, certified Trout on November 24, 2003. *Id.* at ¶ 50. Plaintiff does not know the identity of the supervisor who certified Trout. *Id.* at ¶ 80. Trout did not receive the $1.00 per hour wage increase until he was certified to operate the crane. *Id.* at ¶ 51. Defendant has never trained and certified Trout on the taylor despite his requests; thus, he only receives an extra $1.50 per hour instead of the extra $3.00 per hour Plaintiff receives. *Id.* at ¶ 52. Plaintiff's wage rate has always been equal to or greater than Trout's. *Id.* at ¶ 53.

## F.    Plaintiff's Disciplinary History

Plaintiff was disciplined both before and after he filed his IDHR charge. DR ¶ 81. Defendant contends Plaintiff was disciplined at least as much, and as often, before he filed his charge as he was afterward. DS ¶ 81. Although Plaintiff alleges neither his work performance nor attendance were issues with respect to Defendant's treatment of him, the cited evidence fails to support this assertion. PR ¶ 81; Pl. Ex. G at No. 29, No. Z.6 and Z.7. For example, while Defendant indicated "Complainant was NOT deficient in meeting the job requirements," it also listed deficiencies with respect to Plaintiff's attendance between 2001 and 2004. Pl. Ex. G at No. 29, No. Z.6 and Z.7 (emphasis in original). A number of disciplinary notices were issued with respect to Plaintiff before he filed his charge. DR ¶ 81; Pl. Ex. G at No. 5. Plaintiff does show three disciplinary actions were resolved in his favor through the grievance process—his November 2001 voluntary resignation and his suspensions in July 2005 and in 2006. Pl. Ex. G at No. 5, citing DHR055 and No. 33, citing JHP0004-0006; Pl. Ex. E at 74. In any event, only one disciplinary action issued before Plaintiff filed his charge was resolved in his favor through the grievance process. Pl. Ex. G at No. 5, citing DHR055; Pl. Ex. E at 74. In the three-year period prior to Plaintiff's filing of his charge, he was disciplined on at least eight occasions—including a termination

subsequently rescinded only with the intervention of Plaintiff's union—for infractions involving unsatisfactory work performance, attendance, safety violations, and causing an accident. DS ¶ 82; Def. Att. 25.

## G.    Plaintiff's IDHR Charge

Plaintiff filed his IDHR charge on April 15, 2004. Def. Att. 19. In his charge and subsequent two amendments, Plaintiff alleges that (1) on April 15, 2004, he was not promoted to the position of crane operator on the basis of his race and that Defendant unlawfully promoted Trout instead of Plaintiff; (2) Defendant retaliated against Plaintiff when it issued him the two written warnings of July 30, 2004 and August 11, 2004; and (3) Defendant further retaliated against Plaintiff when ATM Richard Jones referenced Plaintiff's IDHR charge over the two-way radio system used by Defendant personnel and when Jon-Martin Wendt twice assigned hitch-pulling duties to Plaintiff. DS ¶¶ 67, 68, 69, 71; Def. Att. 19, 20, 21, 22.

Plaintiff filed an amended charge on September 1, 2004, alleging Defendant retaliated against Plaintiff when it issued him the two written warnings on July 30 and August 11, 2004. Def. Att. 20. Plaintiff filed a second amendment on September 8, 2004, alleging Defendant further retaliated against him when ATM Richard Jones ("Jones") referenced his charge over the two-way radio system and when ATM Jon Martin Wendt ("Wendt") twice assigned Plaintiff hitch-pulling duties. Def. Att. 21. At his deposition, Plaintiff testified that ATM Jones made the following statement over the company's two-way radio system in September 2004: "We don't want to discriminate against John Malozienc's chances of training on the taylor." DS ¶ 70. Plaintiff asserts Jones was never reprimanded or disciplined. PR ¶ 70. Plaintiff did not check the "continuing action" box on any of the three forms. *Id.* at ¶ 71. Plaintiff claims only African-American employees, and not any

Caucasian employees, discriminated against him on the basis of his race. *Id.* at ¶ 75.

Whether Plaintiff complained to Defendant about race discrimination in advance of filing his charge is disputed. DR ¶ 66. Defendant contends Plaintiff never so complained, pointing to Plaintiff's testimony: "I never, myself, complained to the Company about racial discrimination." DS ¶¶ 66, 98-99; Def. Att. 5. Plaintiff presents evidence that he complained to Defendant about race discrimination through his union on at least one occasion, including an incident in or about May 2003, at which time Paul Garza advised Chris Smith that Smith was discriminating against Plaintiff on the basis of his race in favor of African-American third shift employees. PR ¶ 66; Pl. Ex. A, at 129-132; Dkt. 1, at ¶ 8. Plaintiff also presents evidence that he complained to Paul Garza ("Garza"), a union representative, about an African-American supervisor who treated a group of African-American employees better than Plaintiff. *Id.;* Pl. Ex. A, at pp. 129-32.

## H.     Plaintiff's July 30 and August 11, 2004 Written Warnings

On July 30, 2004, Plaintiff received a written warning from ATM Wendt for failing to verify he moved the correct container to the correct rail track. DS ¶ 54. Plaintiff was issued a written warning on August 11, 2004 for failing to call in his August 4, 2004 absence. *Id.* Whether Plaintiff called on August 4, 2004 to report he was not coming to work is disputed. DRPSAF ¶ 25. Plaintiff alleges he called, but he presents only inadmissible evidence that the tower refused to accept his call. PR ¶ 54.[7] At his deposition, Plaintiff had no recollection of the incidents that prompted the written warnings on July 30, 2004 and August 11, 2004; he now alleges he was not given the opportunity to review the warnings, but subsequently did so and now recalls the incidents. PR ¶ 55. Defendant presents evidence

---

[7]The handwriting on DHR 0015, related to Ex. G, Response No. 5, is hearsay within hearsay.

that Wendt and Walker issued the July 30 and August 11, 2004 written warnings, respectively. DR ¶¶ 54, 56.

TM Barry Tolchin 's name appears on the August 4, 2004 warning. DS ¶ 56. Defendant contends Tolchin did not actually issue or participate in administering the warning, but Plaintiff alleges he observed Tolchin's administrative assistant, James Walker, verbally provide Tolchin with information regarding warnings. Pl. Ex. B, ¶ 21. Pursuant to Defendant's procedure for issuing written warnings for attendance issues in 2004, Walker typed the warning based on information one of Plaintiff's supervisors provided to him. DS ¶ 57. Walker typed Tolchin's name on many written warnings regarding attendance issues, even though Tolchin was not involved in issuing these warnings and did not work on Plaintiff's shift. *Id.* at ¶ 58. Plaintiff presents evidence that Walker did not, and does not, work on his shift. PR ¶ 58. Tolchin's name appears on the written warnings regarding attendance problems that have been issued to many employees, none of whom have filed an IDHR or EEOC charge. DS ¶ 59. Wendt has issued multiple written warnings for infractions similar to those for which Plaintiff was written up on July 30, 2004, and none of those employees have filed an IDHR or EEOC charge. *Id.* at ¶ 60.

Defendant asserts Wendt and Walker did not learn of Plaintiff's IDHR charge until at or around December 2005, at which time Plaintiff filed his Complaint. DS ¶¶ 61, 91; Dkt. 1. This statement is undisputed as to Wendt. PR ¶¶ 61, 91. With respect to Walker, Plaintiff presents evidence that in September 2004, Tolchin told Walker in Plaintiff's presence to provide Plaintiff with a copy of his personnel file, "or else the Illinois Department of Human Rights and its attorneys would enforce the request." PR ¶ 91; Pl. Ex. B at ¶ 31. Thus, Plaintiff presents evidence that Walker became aware of Plaintiff's charge as of September 2004. Ultimately, however, Plaintiff does not present evidence that either Wendt or Walker

were aware of his charge at the time of these two written warnings, and Plaintiff suffered no loss of pay as a result of these actions.  PR  at ¶ 62.

## I.    Plaintiff's Work Assignments on August 26 and August 27, 2004

Assignments for all union employees, including Plaintiff, are made on a day-to-day basis.  DS ¶ 89.  On August 26 and August 27, 2004, Defendant assigned him to perform hitch-pulling duties, which require an employee to assist in the hoisting of a large container using a hitch.  DS ¶ 63; DR ¶ 90.  All employees of all job classifications were assigned all of the jobs about which Plaintiff complains, including hitch-pulling and grounding.  *Id.* at ¶¶ 88, 90.  Plaintiff can be asked to act as a groundman on any given day, and he has done so both before and after he filed his charge.  *Id.* at ¶ 102.  While  Defendant contends job assignments at the facility, including to the taylor and crane, are not made on the basis of seniority (DS ¶ 79), Plaintiff presents Article 15 of the CBA to show seniority governs.  Pl. Ex. K.

The parties dispute the basis upon which hitch-pulling duties are assigned, as well as the reasons why Plaintiff was assigned to perform those duties on August 26 and August 27, 2004. DR ¶¶ 64, 90.  Defendant contends that at all relevant times, including in 2004, it has assigned hitch-pulling and all other duties based on its business needs during a shift—not on the basis of seniority. *Id.* Which employees are assigned hitch-pulling duties is also disputed. Defendant contends operators, groundmen, spotters and hostler drivers all engage in such duties when necessary**.**  *Id.* at ¶ 65.  Defendant asserts numerous African-American employees and non-charge-filing employees have been, and are regularly, assigned hitch-pulling duties by each of the supervisors on Plaintiff's shift, including in 2004.  *Id.* However, Plaintiff presents evidence to demonstrate seniority governs these assignments.  PR ¶ 90. Specifically, Plaintiff points to Articles 6 and 15 of the CBA.  *See* Pl.  Ex.  K at Articles 6,

15.

Plaintiff claims Defendant's practice was to assign junior employees to perform hitch-pulling duties, but he was assigned those duties even when junior employees were available. PR ¶ 64; Pl. Ex. A at 123. Plaintiff also contends if he were certified as an operator, he would have worked as a groundman less frequently. PR ¶ 64; Pl. Ex. A at 32-33, 178. In essence, Plaintiff's contention is he was assigned to hitch-pulling duties more often than junior employees because his operator certification was withheld. *Id.* Walker's testimony supports Plaintiff's contention: "If you're operating that particular day, I'm not going to pull you out of a crane and ask you to pull hitches." Pl. Ex. E at 95.

**J.    Plaintiff's Allegations Regarding Misuse of the Company Radio**

Plaintiff alleges African-American employees ridiculed him in person after he soiled himself. DRPSAF ¶ 28; *see also* Dkt. 1. The comments Plaintiff references in his First Amended Complaint were made by anonymous coworkers over Defendant's two-way radio system. DS ¶ 83; Dkt. 21. The comments were crude, sophomoric grunts, groans and jokes mimicking Plaintiff with respect to two circumstances when he defecated on himself in 2001 and 2003. DS ¶ 83. Plaintiff alleges Defendant's policies prohibit the misuse of radios, including the manner in which the radios were used to harass Plaintiff. PR ¶ 83.

While it is undisputed that no employee was ever reprimanded or disciplined with respect to the misuse of the radios, whether supervisors engaged in these radio communications and whether it was possible to reprimand the individuals are disputed issues. DS ¶ 83-84; PR ¶ 83-84. Defendant contends no supervisors engaged in the behavior and further argues because the noises were made by unidentified, anonymous coworkers, it was impossible to discipline anyone. DS ¶ 84. While Plaintiff does not know whether supervisors engaged in this behavior, he contends it is also impossible for Defendant to know

given its claim unidentified individuals made the noises. PR ¶ 84. Plaintiff also asserts Defendant could have addressed the issue at one of the daily safety meetings with the small number of employees who worked on the third shift. *Id.* The parties also dispute when the comments and noises were made over the radio. DS ¶ 86; PR ¶ 86. Plaintiff avers they occurred before and after he filed his charge. *Id.* Plaintiff complained to Craig Zarnecki ("Zarnecki") about the issue; he was satisfied with Zarnecki's response only to the extent the comments and noises were no longer made to his face; he was dissatisfied the conduct continued–and still continues–over the radio. PR ¶ 86-87.

Other employees were teased over the radio by their coworkers, and this type of radio horseplay was and is common, even though it is not permitted. DS ¶ 85. Plaintiff presents evidence that radio safety was an important concern for Defendant. PR ¶ 85. Plaintiff also argues Jones called meetings of third shift employees to threaten group punishment if employees did not stop whistling at other employees over the radio. PR ¶ 85. According to Plaintiff, the whistling stopped following Jones' threats, but Jones never addressed the noises directed at Plaintiff. *Id.*

**K.      Plaintiff's Additional Allegations Regarding Race Discrimination**

Plaintiff alleges African-American employees received better treatment.  In Summer 2001 and February 2003, Plaintiff observed African-American supervisors Maceo Cotton ("Cotton"), Everett[8] and Chris Smith pick up African-American employees in the van during extremely cold weather and give them breaks, to the exclusion of Caucasian groundmen. PSAF ¶ 11.  Whether African-American supervisors allowed African-American employees to take longer breaks than Plaintiff was allowed to take is disputed.  DRPSAF ¶ 13.  Plaintiff claims in October 2003, he observed an African-American supervisor allow African-American employees to remain on break after Plaintiff was ordered to return to work.  PSAF ¶ 13; Pl. Ex.  A at 126-28.[9]  Plaintiff alleges he was threatened with a write-up for taking a coffee break at that time.  PSAF ¶ 13.  African-American employees were not allowed longer breaks as of approximately late 2004 or early 2005.  Pl. Ex.  A at 128-29. Plaintiff believes non-Caucasian employees used their vacation days easily, while he complains he was given a difficult time by at least one non-white supervisor and Walker.  PSAF ¶ 15.  However, this is unsupported by the evidence and amounts to mere speculation, as Plaintiff lacks personal knowledge about his coworkers here.

Whether African-American supervisors permitted African-American employees to refer to Caucasian employees as "hillbillies" or "rednecks" is disputed.  DRPSAF  ¶ 12. Plaintiff alleges such supervisors failed to admonish the employees in Plaintiff's presence. *Id.*  Cotton used the term "hillbilly" when speaking to Caucasian employees.  PSAF ¶ 14. Defendant contends such a term is not offensive to Plaintiff, however, because Plaintiff testified he did not believe the title of the  television show "The Beverly Hillbillies" is

---

[8]No full name is provided for "Everett."

[9]Deposition testimony regarding how long African-Americans were on break is based upon hearsay.

offensive.  DRPSAF ¶ 14; Pl. Ex. A at 78.

Plaintiff alleges he complained to Walker that Pates was being treated more favorably than he was, but Walker told Plaintiff not to worry about Pates, but to "worry about your own kind."  DRPSAF ¶ 10.  Walker and Pates are African-American.  PSAF ¶ 10.  Plaintiff asserts "Paul Garza was pretty sure that Plaintiff was not the only white employee against whom Defendant discriminated, including an incident involving white employee Perry Bersaw."[10]  PSAF ¶ 17.[11]  Plaintiff claims Walker told him he should quit.  PSAF ¶ 16. Plaintiff reports it seemed as if Walker harassed white employees.  DRPSAF ¶ 16;  Pl. Ex. A at 141.  Plaintiff claims Cotton, an African-American supervisor, followed him when he used the washroom, which commenced in 2002 and increased in frequency after he filed his charge.  PSAF ¶ 29.

Whether Defendant maintains its records poorly is disputed.  DRPSAF ¶ 33.  Plaintiff claims Defendant misidentifies employees' races and fails to specify the machines on which employees are certified.  PSAF ¶ 33.  Plaintiff contends "Defendant has also double-certified black operators, resulting in double raises," indicating "Charles Waller is one example." PSAF ¶ 36.  Defendant admits Waller is certified on the taylor and crane and is entitled to the corresponding wage increases.  DRPSAF ¶ 36.  *See* Pl.  Ex.  B at ¶ 32 and attachments

---

[10]While Plaintiff contends Garza believes "there are no other explanations for Defendant's poor treatment fo Plaintiff other than race discrimination and retaliation," the cited evidence fails to support this assertion.  PSAF ¶ 30; Pl.  Ex.  C at 10-12.  While Plaintiff relies on Garza for the statement that "[s]upervisors routinely mistreated Plaintiff," the cited fails to support this assertion.  PSAF ¶ 30; Pl.  Ex.  C at 13-14.

[11]The Court could strike Paragraph 17 of Plaintiff's Statement of Additional Material Facts because the cited evidence does not support these assertions.  *See* Pl.  Ex.  C at 8-11.  The Court declines to do so, however, because certain pages from Plaintiff's Exhibit C may support Plaintiff's contention to the limited extent that Garza is aware of another white employee, Perry Bersaw, who was assigned to work on the ground for the night when his seniority would have put him in a truck.  The Court also notes the spelling of Perry Bersaw's name is inconsistent in the record.

2394, 2475, and 2852. Plaintiff presents evidence that on June 19, 1997, Defendant determined Waller was a qualified operator and was therefore entitled to the corresponding wage increase; and that on June 23, 2003, Waller received a raise "due to becoming qualified crane operator." *See id.*

## L. Events Following the Filing of Plaintiff's IDHR Charge

Other non-charge-filing employees have been disciplined for the same reasons for which Plaintiff has been disciplined. DR ¶ 103.

### 1. July 2005 Suspension

In July 2005, Walker issued Plaintiff a no-call/no-show warning in Tolchin's name. *Id.* at ¶ 92. Walker believed Plaintiff was taking sick leave at the time but he subsequently learned, after Plaintiff explained Walker was mistaken, that Plaintiff was taking vacation leave. DR ¶ 93. Plaintiff contends it was Tolchin's decision to make Plaintiff grieve the disciplinary action even though Tolchin knew Walker had been mistaken. PR ¶ 93. Plaintiff presents evidence he took sick leave on July 18 and 19, 2005; was not scheduled to work the following two days, July 20 and 21, 2005; but was scheduled to take paid vacation leave the next three days, July 22, 23 and 24, 2005. PR ¶ 94. Plaintiff claims Walker changed Plaintiff's July 22, 23 and 24 scheduled "paid vacation" to unpaid FMLA leave and never changed Plaintiff's July 18 and 19 sick leave from "unexcused leave" to excused FMLA leave, which caused Plaintiff to be suspended for one day. *Id.*

Whether Walker mistakenly, but honestly, took these actions is disputed. DR ¶ 96. Defendant contends Walker honestly, but mistakenly, assumed Plaintiff was taking sick leave—not vacation leave—over the next two days because Plaintiff was out sick for the prior two days. DS ¶¶ 94-95. Defendant further claims when Plaintiff failed to call during the two-day period for which he was disciplined, Walker mistakenly, but honestly, counted

this as a no-call/no-show when Plaintiff was actually on vacation leave. *Id.* at ¶ 96. Plaintiff presents evidence of the surrounding circumstances to challenge both contentions. PR ¶¶ 95-96. Ultimately, after the mistake was brought to Walker's attention, he rescinded the discipline. *Id.* at ¶ 97. Plaintiff contends he spent two months grieving his suspension, during which time Tolchin defended Walker's write up despite evidence that Walker had erroneously disciplined Plaintiff. PR ¶ 97. Plaintiff does not present evidence with respect to Tolchin's intent; however, it is reasonable to infer Tolchin defended Walker because Walker had issued the suspension in Tolchin's name. DR ¶¶ 56, 58-59.

Whether Plaintiff suffered a loss of pay as a result of this incident is disputed. *Id.* at ¶ 98. Plaintiff claims he did not receive a paycheck for two weeks as a result of Walker's classification of Plaintiff's paid vacation as unpaid FMLA leave and that he did not receive his back pay during the two-month period in which he grieved the suspension. PR ¶ 98. While Plaintiff claims he was not provided the contractually required time for an investigation of his wrongdoing prior to being suspended, the CBA does not support Plaintiff's assertion. *See* PSAF ¶ 2; Pl. Ex. K at Art. 24, 25. Specifically, Plaintiff's cited evidence only supports the position that the union has fifteen days within which to investigate an employee's suspension and file a grievance, not that Defendant must wait fifteen days before suspending Plaintiff. *See* DRPSAF ¶ 21.

### 2. April 2006 Disciplinary Action

The circumstances surrounding an April 2006 disciplinary action are also disputed. DR ¶¶ 99-101. While it is undisputed Plaintiff was issued a suspension notice and the disciplinary action was subsequently rescinded, whether a suspension was warranted and whether Plaintiff served a suspension are disputed. DR ¶ 99. Defendant contends the suspension notice was never carried out and was rescinded. *Id.* Defendant also claims

Plaintiff received the suspension notice because he failed to notify Walker he was out sick and failed to provide a written doctor's excuse until after Walker had already mailed the disciplinary notice. *Id.* While Plaintiff presents evidence that he served a one-day suspension and that he called to report his absence, he fails to identify when he provided a doctor's note. Thus, Defendant's assertion that Plaintiff failed to provide a written doctor's excuse until after Walker had already mailed the disciplinary notices is deemed admitted. *Id.* Although it is undisputed this discipline was ultimately rescinded, the surrounding circumstances are disputed. DR ¶ 100. Defendant contends it rescinded the discipline after Plaintiff gave Walker the written doctor's excuse, even though its attendance policy does not require it to do so where an employee fails to call to report absences. DS ¶ 100. Plaintiff presents evidence that he notified Walker of his absence; was forced to file a grievance because Walker and Tolchin did not voluntarily rescind the discipline; and waited one week to receive back pay for the date of his suspension. PR ¶ 100. Plaintiff received pay for the rescinded suspension. *Id.* at ¶ 101.

### 3. Other Allegations

Plaintiff alleges three additional events occurred following the filing of his IDHR charge. First, a supervisor, Darryl Delaney ("Delaney"), told employees no one would be able to "use their seniority to bump into a truck anymore." PSAF ¶ 18. Plaintiff does not present evidence to show Delaney blamed Plaintiff for this change. *Id.* Plaintiff testified this occurred after he filed his charge. Pl. Ex. A at 146-48. Second, Plaintiff claims he was denied a chance to work in Memphis. PSAF ¶ 20. Defendant presents evidence that Plaintiff did not ask to work in Memphis because he testified he had "no idea" how employees were selected to work in Memphis; and Plaintiff did not identify the names or races of the decision makers or of the employees who went to Memphis. DRPSAF ¶ 20; Pl.

Ex. A at 180-81. Third, Plaintiff claims Wendt required him to work outside on the ground on a freezing night shift even though more junior employees were available. PSAF ¶ 22. Plaintiff did not have proper outerwear, and thus required medical attention. *Id.* The evidence Plaintiff presents indicates Jones was not involved in the decision to require him to work outside that night, as Jones was not involved until Plaintiff went into an office to warm up. Pl. Ex. A at 208-09. When Plaintiff did so, Jones was in the office and called an ambulance for him. *Id.* Plaintiff does not recall when this incident occurred. *Id.* at 211. Whether Wendt was aware Plaintiff had filed an IDHR charge at this time is disputed. *See* PR ¶ 91.

## M. Facts Relevant to the Timeliness Issue

As discussed above, on August 19, 2008, this Court denied Defendant's motion for summary judgment on the issue of timeliness. *Malozienc v. Pacific Rail Services*, 572 F. Supp. 2d 939 (N.D. Ill. 2008). (Dkt. 100) ("August 19, 2008 Opinion"). The Court adopts and incorporates the facts as they existed as of the August 19, 2008 Opinion. This Memorandum Opinion and Order sets forth only those additional facts the parties provided in their supplemental pleadings.

The additional discovery the Court permitted following the entry of its August 19, 2008 Opinion revealed a December 17, 2004 communication from Plaintiff to the EEOC and the IDHR. The circumstances surrounding this newly discovered evidence are disputed. On December 17, 2004, Plaintiff dated and signed a document, which states as follows: "I am withdrawing Charge Number 2004CF3000 from the Illinois Department of Human Rights and hereby request a Right to Sue Notice from EEOC on the following Charge: EEOC Number: 21BA41770" ("December 17, 2004 document" or "the document"). PSR ¶ 104;

Def. Supp. Att. 1; Def. Supp. Att. 2, at 278-280.[12] Plaintiff presents evidence that he signed, dated and returned the document pursuant to the instructions he received from the IDHR investigator in response to his request that the investigation of his charge be withdrawn from the IDHR in favor of the EEOC. PSR ¶¶ 104, 105; Def. Supp. Att. 2, at 280-86; Pl. Supp. Ex. 1, at ¶¶ 6-18; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18). Plaintiff thoroughly read the document before returning it to the IDHR as instructed. PSR ¶¶ 105, 106; Def. Supp. Att. 2, at 280-86; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18). Plaintiff presents evidence that he understood the document would effectuate his request to transfer his charge to the EEOC for investigation. PSR ¶ 106; Def. Supp. Att. 2, at 282-86; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18).

---

[12]Citations to the record regarding the supplemental pleadings on the timeliness issue are in the following form: Defendant's Supplemental Motion for Summary Judgment on the Issue of Whether Plaintiff's Complaint Was Timely Filed is cited as DSM ¶ __; Defendant's Memorandum of Law in Support of its Supplemental Motion for Summary Judgment on the Issue of Whether Plaintiff's Complaint Was Timely Filed is cited as DMSSM ¶ __; Defendant's Amended Local Rule 56.1(a)(3) Statement of Materials Facts as to Which There is No Genuine Issue is cited as DAS ¶ __; Defendant's Attachments to its Amended Local Rule 56.1(3) Statement of Material Facts are cited as Def. Supp. Att.__; Plaintiff's Local Rule 56.1(b)(3) Response to Defendant's Amended Statement of Material Facts to Which There is No Genuine Issue is cited as PSR ¶ __; Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts Requiring the Denial of Defendant's Supplemental Motion for Summary Judgment With Respect to Whether Plaintiff's Complaint Was Timely Filed is cited as PSSAF ¶ __; Plaintiff's Response to Defendant's Supplemental Motion for Summary Judgment Regarding Whether His Complaint Was Timely Filed is cited as Pl. Supp. Resp.__; Plaintiff's Exhibits in Support of His Response to Defendant's Supplemental Motion for Summary Judgment Regarding Whether His Complaint Was Timely Filed are cited as Pl. Supp. Ex.__; and Plaintiff's October 31, 2008 Deposition Exhibits are cited as Pl. Dep. Ex.__.

Plaintiff sent two documents to the IDHR regarding the withdrawal of his charge, including the December 17, 2004 document. PSR ¶ 108. Specifically, Plaintiff returned to the IDHR the document along with another form, both of which were sent to him by the IDHR in response to his request to transfer his charge to the EEOC. PSR ¶¶ 105, 106, 108; Def. Supp. Att. 2, at 281-86; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18). One of these forms was provided to him in error, as the IDHR investigator told Plaintiff he was uncertain as to which forms the IDHR had previously sent Plaintiff in response to his request to transfer the investigation. PSR ¶ 108; Def. Supp. Att. 2, at 282-286; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18). While Plaintiff never contacted the EEOC or the IDHR to inquire as to the meaning of the December 17, 2004 document or to learn which form was correct, he presents evidence that he spoke with the IDHR investigator on the telephone regarding the multiple withdrawal forms the IDHR sent to him in response to his transfer request. PSR ¶ 107; DAS ¶¶ 107, 110; Def. Supp. Att. 2, at 278-89. When he returned the two forms to the IDHR, Plaintiff knew that one of the forms was incorrect in that it would not operate to transfer his charge to the EEOC. DAS ¶ 110.

However, Plaintiff testified that he returned both documents simultaneously because the IDHR representative had expressed confusion regarding which documents the IDHR had sent to Plaintiff in response to his request. Def. Supp. Att. 2, at 285; Pl. Ex. 6 (Pl. Dep. Exs. 16-18). Plaintiff testified that he did not want to further delay the transfer of the investigation of his charge from the IDHR to the EEOC by returning only the incorrect form. PSR ¶ 110; Def. Supp. Att. 2, at 285; Pl. Supp. Ex. 6 (Pl. Dep. Exs. 16-18). While Defendant contends Plaintiff understood the function of a right-to-sue notice as of May 4, 2005, Defendant fails to provide evidence that Plaintiff had such an understanding in December 2004. PSR ¶ 109. To the contrary, Plaintiff presents evidence that he did not

understand the function of a right-to-sue notice as of December 2004. Def. Supp. Att. 2, at 283.

## II. LEGAL STANDARD

A court may grant summary judgment when the "pleadings, the discovery, and discovery materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 255. The movant bears the burden of establishing that there exists no genuine issue of material fact. *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986); *Hedburg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). The party bearing the burden of proof on any issue at trial may not rest on the pleadings, but must "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Summary judgment is inappropriate when alternate inferences can be drawn from the evidence, as the choice between reasonable inferences from facts is a jury function. *Id.; Spiegla v. Hall*, 371 F.3d 928, 935 (7th Cir. 2004). The Court accepts the non-moving party's version of any disputed facts only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). The summary judgment standard is applied with scrutiny in employment discrimination cases, which often rely on issues of intent and credibility. *Krchnavy v.*

*Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

## III. DISCUSSION

**A.     Continuing Violation Doctrine**

Title VII requires a plaintiff to file an EEOC charge within 300 days of the discrimination or harassment. 42 U.S.C. 2000e-5; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Defendant argues the Court should not consider acts alleged to have occurred prior to the 300-day period preceding the April 15, 2004 filing of Plaintiff's IDHR charge. Defendant seeks to limit Plaintiff's allegations of race discrimination to those within the 300-day period from June 20, 2003 to April 15, 2004. Invoking the continuing violation doctrine, Plaintiff argues consideration of acts outside the 300-day period is appropriate. *See id.* at 105. This Court agrees.

In *Morgan*, the Supreme Court explained when a plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts outside the 300-day limitations period. The doctrine functions differently according to the type of act alleged—"discrete" discriminatory acts or acts contributing to a hostile work environment. *Id.* at 114-15. With respect to "discrete" acts, each act "starts a new clock for filing charges" on the date the act "occurred." *Id.* at 113. Any discrete acts outside the limitations period are time-barred even though they may relate to other discrete acts within the period. *Id.* at 112-13. Examples of discrete acts include "termination, failure to hire, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. With such acts, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.*

In contrast, with respect to acts contributing to a hostile work environment, the Court explained the "very nature" of such claims involves "repeated conduct" that "may not be actionable on its own." *Id.* at 115. Instead, "such claims are based on the cumulative effect of individual acts." *Id.* Thus, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105. The Court reasoned the "incidents constituting a hostile work environment are part of one unlawful employment practice." *Id.* at 118. Applying the *Morgan* framework, this Court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice." *Id.* at 120. If the acts are so related, this Court must ascertain "whether any act falls within the statutory period." *Id.*

The Seventh Circuit's analysis in *Lucas v. Chicago Transit Authority* is instructive. As *Lucas* notes, "[t]he concept of *cumulation* suggests a critical limiting principle. Acts ... so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." 367 F.3d 714, 727 (7th Cir. 2004); *see also Lapka v. Chertoff*, 517 F.3d 974, 981 (7th Cir. 2008) (finding doctrine applied where plaintiff referred to a series of concrete events, the cumulative effect of which formed a "single unlawful employment practice"). In *Lucas*, the court examined the nature of the plaintiff's allegations to determine whether they constituted a hostile work environment claim because the plaintiff failed to point to actions that contributed to such a claim. *Id.* at 724-25. Thus, the court examined the plaintiff's brief "to assess whether he may have a hostile work environment claim that merits the inclusion of otherwise barred claims." *Id.* The plaintiff made only two references to

support such a claim: that his supervisor retaliated against him four years before he filed his EEOC charge and that his affirmative action unit found cause for discrimination but failed to discipline the supervisor. *Id.* at 725. Ultimately, the continuing violation doctrine did not apply because the plaintiff failed to point to an act that was part of the same hostile work environment claim and that fell within the limitations period. *Id.* at 725-28.

In view of this case law, and drawing all reasonable inferences in favor of Plaintiff, the acts about which Plaintiff complains can reasonably be linked together into a single chain or course of conduct to defeat the statute of limitations. *See Lucas*, 367 F.3d at 727; *Lapka*, 517 F.3d at 981. Plaintiff repeatedly refers to the negative workplace environment in his *pro se* Complaint[13]; First Amended Complaint, which was filed by appointed counsel; and materials filed in response to the motion at issue. *See* Dkt. 1, 15, 77, 78. Such allegations describe "efforts either by coworkers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to [Caucasians] ('hostile work environment' harassment)." *See Eager v. Commonwealth Edison Co.*, 187 F.Supp.2d 1033, 1038 (N.D. Ill. 2002) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)).

Plaintiff argues the range of conduct he alleges constitutes an adverse action under *Nichols v. Southern Ill. Univ. Edwardsville*. 510 F.3d 772 (7th Cir. 2007) (explaining an adverse action for purposes of a discrimination claim can result where "conditions in which [Plaintiff] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment"). Although some of these acts occurred outside the 300-day filing period, they are related to those acts alleged to constitute a discriminatory training and certification process that occurred on an ongoing basis during the filing period. Viewed in a light most favorable to

---

[13]The district court stated the "Complaint is based on hostile work environment . . . ." Dkt. 6.

Plaintiff, his allegations support a pattern of similar conduct consistent with the "very nature" of hostile work environment claims that involve "repeated conduct" that "are based on the cumulative effect of individual acts." *See Morgan*, 536 U.S. at 115. In effect, Defendant urges the Court to drastically limit Plaintiff's allegations and treat them as isolated events devoid of contextual significance. This Court declines to do so. Considering the entire spectrum of repeated conduct is appropriate, as the allegations regarding the nature of the work environment are relevant and should be considered in context. For purposes of this doctrine, this Court gives Plaintiff the benefit of the doubt and reviews his claims in totality.

Moreover, this is not a stand alone claim for failure to promote at a specific time. Here, it is reasonable to view the series of acts about which Plaintiff complains as part of the same actionable hostile work environment claim. While Plaintiff did not expressly label his claim as such a claim, this Court finds the *Morgan* analysis applies given the continuous nature of the conduct Plaintiff alleges and the fact that courts examine the nature of claims to determine whether a discrete act or hostile work environment analysis is appropriate.

This Court disagrees with Defendant's assertion that the continuing violation doctrine does not apply because Plaintiff did not check the "continuing action" box or otherwise indicate in his charge that Defendant's conduct constituted a continuing action. For a claim to be fairly encompassed within an EEOC charge, it must be "like or reasonably related" to the charge, and could be expected to grown out of the allegations in the charge. *See Gawley v. Indiana Univ.*, 276 F.3d 301, 313 (7th Cir. 2001). As discussed above, the nature of Plaintiff's claim is reasonably related to the issues raised in his IDHR charge, which alleged a discriminatory certification and promotion practice, harassment by his supervisors with respect to job assignments and a "mocking" reference to Plaintiff over the company radio. One of the central purposes of the employment discrimination charge is to put employers on

notice of "the existence and nature of the charges against them." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77 (1984). This Court finds Plaintiff provided Defendant with such notice. Moreover, this Court declines to deem a *pro se* Plaintiff's failure to check the "continuing action" box as fatal to his claim and notes his appointed counsel subsequently alleged the violations described in Plaintiff's charge "were and remain continuing violations." Dkt. 15.

Finally, Defendant argues this Court should not consider retaliatory acts alleged to have occurred after the September 8, 2004 filing of Plaintiff's second amendment to his IDHR charge. Defendant contends the alleged acts occurring after Plaintiff's September 2004 filing of his two amendments are outside the scope of his retaliation charge. Applying the above framework, this Court disagrees. Viewed in a light most favorable to Plaintiff, there is a nexus between Plaintiff's claims in that they constitute the same ongoing unlawful employment practice that involved a range of discriminatory, harassing, and retaliatory behavior. In sum, this Court finds the continuing violation doctrine applies, rendering review of the entire spectrum of Plaintiff's discrimination and retaliation allegations appropriate.

**B.     Race Discrimination**

A Title VII race discrimination claim can survive summary judgment if the plaintiff presents either direct or circumstantial evidence of discrimination (the "direct method") or indirect evidence that satisfies the three-part, burden shifting test set forth in *McDonnell Douglas Corp. v. Green* (the "indirect method"). *See* 411 U.S. 792 (1973); *Phelan v. Cook County*, 463 F.3d 773, 779-782 (7th Cir. 2006). Defendant argues Plaintiff's claims fail under both methods. Plaintiff avers he establishes triable issues of fact under both methods.

### 1. Direct Method

Plaintiff argues his claim survives summary judgment because he provides sufficient circumstantial evidence of discrimination. To prevail using the direct method, a plaintiff must "essentially [show] an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Because such admissions are rare, a plaintiff can also show a "'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir.2005). Circumstantial evidence must directly show there was a "discriminatory reason [behind] the employers' action." *Id.* Defendant contends Plaintiff fails to make such a showing. This Court agrees.

Plaintiff relies solely on circumstantial evidence, arguing substantial evidence of disparate treatment based on race exists. In so doing, Plaintiff points to three contentions: "non-white third shift employees were routinely treated better than Plaintiff; participation by the putative Human Resources employee (Walker) as well as by non-white third-shift supervisors in unjust activities; and multiple findings that adverse actions were unjust, i.e. the resolution of multiple grievances in Plaintiff's favor." Dkt. 77, citing PR ¶¶ 99, 100, 103. Under the direct method, a plaintiff can rely upon circumstantial evidence such as "ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group . . ., [and] evidence . . . that employees similarly situated to the plaintiff [but not members of the protected class] received systematically better treatment." *Sinio v. McDonald's Corp.*, 2007 U.S. Dist. LEXIS 24174, at *21-22 (N.D. Ill. Mar. 19, 2007). However, "stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment." *Nichols,* 510 F.3d at

781-82.  Plaintiff relies upon *Phelan*, in which the plaintiff was terminated shortly after filing a medical leave request related to verbal abuse and physical assaults she suffered at the hands of coworkers and supervisors.  463 F.3d at 781-82.  The *Phelan* court found the plaintiff produced "an abundant body of evidence sufficient to establish a question of material fact," as there was undisputed evidence that she was physically assaulted by employees and supervisors whose motivations were gender-related.  *Id.* at 781.  Moreover, human resources threatened to terminate her if she continued to complain about gender-related mistreatment and the individual who terminated her made discriminatory comments to her before ultimately doing so.  *Id.* at 782.

Here, Plaintiff cites to three specific responses to Defendant's Local Rule 56.1 Statement—Responses to Paragraphs 99, 100 and 103.  However, as discussed above, Plaintiff fails to present any evidence to refute Defendant's statement in Paragraph 103, and he likewise fails to present evidence to refute parts of Defendant's statements in Paragraphs 99 and 100.  Thus, Plaintiff admits other non-charge filing employees have been disciplined for the same reasons for which he has been disciplined.  The remaining circumstantial evidence presented in Plaintiff's Responses to Paragraphs 99 and 100, even when viewed in a light most favorable to him, is far from a "convincing mosaic of circumstantial evidence" supporting his race discrimination claim.  *See Phelan*, 463 F.3d at 779.  In sum, Plaintiff does not present the type of admissible evidence relied upon by the courts in the cases he cites and fails to create a triable issue of fact under the direct method.

## 2.    Indirect Method

Defendant argues Plaintiff fails to prove his case using the indirect method.  *See* 411 U.S. at 802.  It is undisputed Plaintiff meets the first two prongs of the four-part test —(1) he is a member of a protected class and (2) he was meeting Defendant's legitimate job

requirements. *Id.; see Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Thus, the dispute centers on whether he satisfies the third and fourth prongs—(3) whether he suffered an adverse employment action; and (4) whether he was treated less favorably than similarly situated employees outside of the protected class. *Id.* If Plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to Defendant to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id.* If Defendant meets this burden, Plaintiff must show Defendant's purported reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id.* The ultimate burden of persuasion remains at all times with Plaintiff. *Id.*

### A. Adverse Employment Action

Defendant contends Plaintiff has not suffered any adverse employment action, urging there are no triable issues of fact. Plaintiff argues there are triable issues of fact. "A materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Nichols,* 510 F.3d at 780 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Id.* (quoting *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)). Thus, the Seventh Circuit recognizes three categories of cases where a requisite act of discrimination exists, only one of which is applicable here: cases in which "the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Nichols*, 510 F.3d at 772. This category includes cases of harassment, as long as the mistreatment by coworkers or supervisors is sufficiently

severe to worsen substantially the conditions of employment as they would be perceived by a reasonable person in the position of the employee. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). The Court may choose to view the allegations in the totality of the circumstances. *See Wei v. Chi. State Univ.*, 2003 U.S. Dist. LEXIS 15083, at *18-19 (N.D. Ill. Aug. 28, 2003).

Plaintiff offers a "plethora" of adverse actions in a brief list format, urging they fall within the *Nichols* category. Plaintiff alleges Caucasian employees suffered racial harassment generally, claiming they were subject to "the assignment of only white third shift employees [] to operate a less desirable piece of machinery (the taylor)," "a difficult time generally concerning the taking of vacation," and "double-paying black operators for repeated certification on the same machine." These allegations regarding general discriminatory treatment are insufficient to provide evidence of a negative work environment in that Plaintiff fails to support these allegations or provides either inadmissible evidence or a lack of specific details regarding any particular instances of such treatment. The Court cannot make any informed assessment of these incidents with only these general allegations, and it is not its place to hold a mini-trial on each allegation. Consequently, these allegations cannot provide the basis for Plaintiff's claim. *See Tutman v. WBBM-TV/CBS Inc.*, 54 F.Supp.2d 817, 826 (N.D. Ill. 1999). However, the Court will consider the remaining three allegations in accordance with the available evidence, and it will examine Plaintiff's allegations regarding his own treatment. For analytical purposes, it is appropriate to categorize all of the allegations, the cumulative effect of which the Court considers to determine if any are actionable.

### 1.    Work Environment – With Respect to Caucasian Employees

Plaintiff makes three allegations regarding the general work environment.  First, Plaintiff alleges African-American supervisors failed to admonish in Plaintiff's presence African-American employees who referred to Caucasian employees as "hillbillies" or "rednecks."  Second, he describes two incidents in 2001 and 2003 when only non-Caucasian employees were allowed to take breaks or to warm up in the vans in cold weather.  Third, he describes one 2003 incident when African-Americans were allowed to take a longer break than he was.  Even when viewed together, these allegations lack the requisite amount of evidence required to defeat summary judgment.

While the category the Seventh Circuit recognizes with respect to workplace conditions includes cases of harassment, *see supra,* the mistreatment by coworkers or supervisors must be sufficiently severe to worsen substantially the conditions of employment as they would be perceived by a reasonable person in the position of the employee. *Herrnreiter*, 315 F.3d at 744-45.  Judicial standards must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788.

Significantly, Plaintiff does not show other employees complained about these occurrences.  Thus, such allegations fail to satisfy the applicable objective standard.  *See Herrnreiter*, 315 F.3d at 744-45.   Plaintiff does not cite to any case law to support the proposition that the terms "hillbillies" or "rednecks" are offensive to a reasonable person in Plaintiff's position.  In fact, Plaintiff testified that he did not find the television show "The Beverly Hillbillies" to be offensively named.  Plaintiff does not offer evidence regarding how frequently these terms were used.  Plaintiff also does not offer any evidence regarding whether he or other Caucasian employees ever requested to warm up in the van, nor does he

explain what reasons were given as to why these events were limited to non-Caucasian employees. Finally, Plaintiff does not cite to any case law to show allowing non-Caucasian employees to take even multiple breaks of greater length than those allowed of Caucasian employees constitutes an adverse employment action. Even when viewed together and in a light most favorable to Plaintiff, these allegations are not sufficiently severe to worsen substantially the conditions of employment as they would be perceived by a reasonable person in Plaintiff's position. Thus, without more, any disputed issues of fact related to these occurrences do not require a trial. Summary judgment is granted with respect to these events.

## 2. Work Environment – With Respect to Plaintiff

Plaintiff presents four allegations related to his work environment, claiming he was: (1) "told by non-white Administrative Assistant Walker to worry about his 'own kind'"; (2) "told by Walker he should quit"; (3) "followed to the washroom by non-white manager Maceo Cotton"; and (4) "ridiculed by non-white employees who were never disciplined."

The statements Plaintiff attributes to Walker, even when viewed in a light most favorable to Plaintiff, do not rise to the level of an adverse employment action. It is undisputed that Walker is an administrative assistant who did not work on Plaintiff's shift. Thus, he was not responsible for any decisions with respect to training, certification or work assignments. Additionally, Plaintiff does not show Walker made these comments in the context of making any decisions nor taking actions against Plaintiff. Therefore, to the extent the comment "worry about your own kind" is ambiguous and thus could present an issue for trial, that is not the case on these facts. *Cf. Phelan,* 463 F.3d at 781-82 (under direct method of proof, evidence that, for example, plaintiff was physically and verbally abused by multiple employees and a supervisor, instructed repeatedly that her workplace was "no place for a woman," subjected to discriminatory comments by the hearing officer who ultimately

terminated her, and ordered to stop contacting human resources was sufficient to survive summary judgment).

Plaintiff cites no authority that being followed into the washroom on occasion constitutes an adverse employment action. Nor does he show this alleged conduct was sufficiently severe to worsen substantially the conditions of employment as they would be perceived by a reasonable person in the position of the employee. *See Herrnreiter*, 315 F.3d at 744-45. Even viewed in a light most favorable to Plaintiff, he fails to provide sufficient evidence to show this is an adverse employment action. For example, he testified: "I had noticed it a couple times that [Cotton] had done this in 2002 and a couple times prior to that." Pl. Ex. A at 102-103.

Finally, Plaintiff claims he was "ridiculed by non-white employees who were never disciplined." *See* PSAF ¶ 28. Plaintiff cites only to one paragraph of his statement of additional material facts, which in turn refers to only one page of his deposition testimony. Based on this evidence, Plaintiff's complaints are limited to ridicule to which he was subjected in person. Plaintiff does not include in his argument related to race discrimination the alleged ridicule over the radio regarding incidents when he soiled himself. Thus, the Court will not address that issue, which Plaintiff presents and the Court analyzes with respect to Plaintiff's retaliation claim. Plaintiff was satisfied with Zarzecki's response in that the comments were no longer made to his face. In light of the case law, even when viewed in a light most favorable to Plaintiff, he does not present sufficient evidence that this alleged harassment constitutes an adverse employment action. *See Herrnreiter*, 315 F.3d at 744-45. Significantly, this ridicule occurred "only a few times before" he filed his first IDHR charge. Pl. Ex. A at 85. Thus, it amounts to the "occasional teasing" judicial standards must "filter out." *Faragher*, 524 U.S. at 788.

In sum, Plaintiff has not brought forward any evidence from which a jury could infer these claims rise to the level required of an adverse employment action. Thus, any factual disputes related to these claims are not material. Summary judgment is granted with respect to these events.

### 3.    Discriminatory Training and Certification

Plaintiff claims he was passed over in favor of third shift non-Caucasian employees junior to him for training and certification. He argues he was not trained in a timely manner and was affected adversely by Defendant's failure to follow the CBA's seniority requirements, suffering ridicule and humiliation as a result. To be an actionable adverse employment action, a plaintiff alleging failure to train must offer evidence sufficient to demonstrate that preclusion from training resulted in a tangible, negative impact on the plaintiff's employment. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 528-29 (7th Cir. 2003) (denial of training is not an adverse action if it has no tangible, negative impact on employment).

Here, there are disputed issues of material fact with respect to whether and when Defendant had a formal process governing training and certification. Plaintiff presents a range of evidence that even between 2001 and 2004, employees who signed up for training were required to receive it in seniority order. *See supra*, I.C. Plaintiff claims after his hire in March 2001, he signed up for training in 2001 and 2002, but did not receive it even though his non-Caucasian coworker, Trout, who is junior to Plaintiff, received training from approximately late 2001 until 2003. Trout was certified on the crane on November 24, 2003. Plaintiff also presents evidence that he again signed up for training in 2004. However, Plaintiff was not trained on the crane until approximately June through October 2005, at which time his training stopped. The reason why his training ceased is disputed. Plaintiff

presents evidence his training did not resume until November 2006; and he was certified on the crane on November 27, 2006. Thus, Trout was certified on the crane three years before Plaintiff was so certified.

Plaintiff's job responsibilities were affected during this entire time. Plaintiff also alleges had he been timely trained and certified, he would have received a raise sooner. In October 2002, Plaintiff received the contractual $1.00 per hour wage increase as if he was certified to operate the taylor, crane, or both machines. Thus, for a period of time, he earned the maximum wage rate even though he was not actually certified to operate either machine. He was certified to operate the taylor in February 2005. At that time, the incentive was increased to $1.50 per hour if the employee could operate one of the two machines and to $3.00 per hour if the employee could operate both machines. Plaintiff received the additional $.50 per hour increase. When he was certified on the crane in November 2006, he received the $1.50 per hour increase. Thus, until February 2005, Plaintiff did not suffer any financial harm as a result of his lack of crane certification. However, from February 2005, when the incentive was increased, until his certification in November 2006, he was not eligible to receive the additional $1.50 per hour.

Plaintiff claims his delayed training and certification negatively affected his employment in another respect. He believes if he had been properly trained, certified and allowed to operate the machinery—as opposed to merely being paid to do so—he would have earned the respect of his coworkers, who in turn would not have ridiculed him because they would not resent him for being paid for work he could not and did not perform.

Plaintiff's allegations related to discriminatory training and certification represent the crux of his race discrimination claim. It is significant that the parties present competing affidavits, email messages and documents regarding this issue. *See supra*, I.C. This Court

cannot make credibility determinations at this stage, as such issues are reserved for the jury. *Krchnavy*, 294 F.3d at 875 ("The summary judgment standard is applied with scrutiny in employment discrimination cases, which often rely on issues of intent and credibility"). Thus, material questions of fact exist regarding a number of issues, including how the training and certification process actually operates; whether training and certification are indistinguishable; and whether and to what extent Plaintiff was impacted as a result of receiving pay as if he was certified rather than actually being certified. All Plaintiff must do to survive summary judgment is present sufficient evidence to show a genuine issue of material fact exists in that a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 255. In light of the evidence he puts forward at this stage, Plaintiff has made such a showing.

While Defendant emphasizes Plaintiff was the only employee who was trained and certified on the crane in 2006 even though he did not sign the 2006 sign-up sheet, this argument misses the mark. Plaintiff presents evidence that he signed up for training in 2001, 2002 and again in 2004. Plaintiff also presents evidence that he began training in 2005; thus, it is reasonable to infer he had no reason to sign up for training in 2006. Thus, there still exist questions of material fact with regard to whether Plaintiff's training and certification were delayed and conducted in a discriminatory manner well before 2006.

According to Plaintiff's own argument, Defendant emphasizes, seniority does not apply to training and certification because Article 15 of the CBA states that "employee seniority, and not the equipment, shall prevail in all instances except for promotions." Pl. Ex. K, Art. 15. Because Plaintiff characterizes certification as a promotion, Defendant argues, seniority does not apply. *See* DR ¶ 21; Def. Att. 19. However, at this stage, a court must indulge all reasonable inferences in a plaintiff's favor. *See Washington v. Ill. Dep't*

*of Revenue*, 420 F.3d 658, 662-63 (7th Cir. 2005). Viewing the evidence in a light most favorable to Plaintiff, training and certification are distinct steps; training is the process by which an employee may be considered for a promotion and is a prerequisite to consideration for certification, which is the promotion itself. Plaintiff presents evidence from which it is reasonable to infer training and certification are distinct steps and the former is not necessarily a guarantee of the latter. *See, e.g.,* Pl. Ex. L. In the alternative, this presents a question of material fact appropriate for resolution by a jury, as a jury could find Plaintiff's deprivation of training constitutes a materially adverse employment action. Therefore, summary judgment is denied with respect to Plaintiff's training and certification claim.

### 4.    Work Assignments

Plaintiff alleges he was assigned to perform "less desirable work when junior employees were available." Based upon citations to Local Rule 56.1 submissions, the Court understands this claim encompasses job assignments to perform ground work and work on the taylor. First, Plaintiff claims he was continually assigned to perform ground work despite the availability of junior employees and the CBA's provision that seniority governs. Although there exist disputed issues of fact with respect to whether the CBA requires seniority to govern assignments, these questions are not material. Significantly, Plaintiff admits that employees can be asked to perform ground work at any time; that assignments for all union employees are made on a day-to-day basis; and that all employees of all job classifications were assigned all of the jobs about which he complains. While Walker's testimony could support Plaintiff's contention, he testified in the context of productivity. Moreover, he is an administrative assistant who did not and does not work on Plaintiff's shift and thus has no involvement as a supervisor does in assigning work on a daily basis. *See* Pl. Ex. E at 95. Thus, any factual dispute is not material.

Second, Plaintiff claims he was forced to train on and operate the taylor, which he alleges is an undesirable machine. Plaintiff fails to demonstrate sufficient evidence that this is a materially adverse employment action for a number of reasons. There is no evidence Plaintiff was ever "forced" to be trained on the taylor. To the contrary, Plaintiff testified repeatedly that he wanted to train on the taylor, and he questioned why another employee was trained before he was trained. In addition, it is undisputed Plaintiff's training and certification on the taylor entitles him to receive a higher wage rate. Thus, any complaints Plaintiff voices with respect to his assignments to work on the taylor fail, as he presents merely subjective preferences. *See, e.g., Nichols,* 510 F.3d at 781 (no adverse employment action where plaintiffs argued they preferred certain work, there was no evidence assignment impacted plaintiffs' salary, perks, or opportunities for advancement, and where three of four plaintiffs requested to work at the location they purported to disdain); *Herrnreiter,* 315 F.3d at 745 (plaintiff's idiosyncratic preference for one job over another does "not justify trundling out the heavy artillery of federal antidiscrimination law"); *Markose v. Ill. Dept. of Human Services,* 2005 WL 233813, at *10 (N.D. Ill. 2005) (finding plaintiff's deployment to other units apart from her "regular" unit was not an adverse employment action where plaintiff did not show the assignment was an objectively inferior job and did not allege it deprived her of skills for which she was trained, but merely expressed a subjective preference).

The Court's conclusions with respect to these job assignments are not only supported by the evidence, but also by the Seventh Circuit case law, which declines to find similar actions constitute adverse employment actions. For example, in *Kersting v. Wal-Mart Stores, Inc.*, the court found assignment to work in "an undesirable work area called 'the cage'" was not an adverse employment action because there was no evidence other

employees perceived it as undesirable and there was "no evidence that work in the cage involved lower pay, different hours, or any sort of hindrance from earning" the wages to which the employee was entitled under company policy. 250 F.3d 1109, 1119 n. 2 (7th Cir. 2001). In addition, similar claims fail where, as here, a plaintiff presents no factual basis to show his temporary assignment altered the "terms or conditions" of his employment in a material way, nor any evidence a reasonable employee would find it to be materially adverse. *Anderson v. The Foster Group*, 521 F.Supp.2d 758, 779 (N.D. Ill. 2007). *Compare Burlington*, 126 S.Ct. at 2417 (reasonable jury could conclude "complete reassignment of responsibilities would have been materially adverse to a reasonable employee"); *Tart v. Ill. Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004) (reasonable jury could conclude reassignment that deprived employees of supervisory status, independence, opportunity to work indoors, computer access, and ability to perform skilled labor was materially adverse). In sum, Plaintiff fails to show sufficient evidence that these job assignments constitute materially adverse employment actions. Summary judgment is granted with respect to these events.

### 5.     Vacation Time

While Plaintiff claims he was "unfairly stripped of his paid vacation time," as discussed above, this is unsupported by the evidence and amounts to mere speculation. Summary judgment is granted with respect to this claim.

In sum, this Court finds there is sufficient evidence to create a genuine issue of material fact regarding the adverse employment action element. Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find the alleged discriminatory training and certification practices constitute an adverse employment action. As discussed above, none of Plaintiff's other claims regarding adverse employment actions survive summary judgment. As a matter of law, these claims do not rise to the level of an adverse

employment action nor create a material issue of fact for the jury. Thus, this Court grants summary judgment on all of Plaintiff's claims except for his claim regarding discriminatory training and certification. That claim presents a question of material fact appropriate for resolution by a jury, as a jury could find Plaintiff's deprivation of training constitutes a materially adverse employment action. Plaintiff must create a genuine issue of material fact regarding all elements of his *prima facie* case with respect to his claim of discriminatory training and certification. *Hsieh v. R.R. Donnelley & Sons Co.*, 2006 U.S. Dist. LEXIS 89672, at *10 (N.D. Ill. Nov. 30, 2006). Thus, this Court will further analyze Plaintiff's claim related to discriminatory training and certification.

### B.    Similarly Situated – Training and Certification Only

Defendant contends Plaintiff fails to identify any similarly situated employee who was treated more favorably than he was, urging Plaintiff was treated more favorably than similarly situated non-Caucasian employees. Plaintiff argues there are triable issues of fact concerning whether there were similarly situated non-white employees were treated more favorably.

To survive summary judgment, a plaintiff must identify at least one other similarly situated employee who was treated more favorably than plaintiff and who was not a member of the protected class. *Whittaker v. Northern. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). The employee must be "similarly situated with respect to performance, qualifications, conduct" and must have "engaged in similar conduct without sufficient differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). As discussed above, Plaintiff's training and certification claim is the only claim that rises to the level of an adverse employment action. Therefore, this Court analyzes only that claim. With respect

to training and certification, this Court focuses solely on Trout, as he is the only African-American employee with less seniority than Plaintiff whom Plaintiff alleges received favorable treatment. To be similarly situated, Plaintiff and Trout must be substantially similar "in all material respects," so as to suggest Plaintiff "was singled out for worse treatment." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007); *Radue*, 219 F.3d at 618.

Here, Defendant presents evidence that Trout asked operator Hodge to train him on the crane shortly after he was hired in October 2001. Hodge agreed to train Trout at his request; Trout received such training over the next one to two years and asked a supervisor to consider him for certification. Plaintiff presents evidence that Trout worked the same shift, reported to the same supervisors, and held the same position with the same job responsibilities as Plaintiff at one time. Three to four supervisors worked on Plaintiff's shift throughout his employment. It is undisputed that both African-American and Caucasian supervisors shared Plaintiff's shift and were able to certify employees on machines. Plaintiff does not know which supervisor certified Trout on the crane in November 2003. In the meantime, Plaintiff claims he was denied an opportunity to train even though he signed up for training in 2001, 2002 and again in 2004. Plaintiff's wage rate has always been equal to or higher than Trout's wage rate. Thus, the question centers on whether Trout was treated more favorably in terms of job responsibilities, opportunities for advancement and respect among coworkers.

Defendant argues Plaintiff's failure to identify which specific supervisor was responsible for treating Trout more favorably is fatal to this element. That is, it may be difficult to say the difference in treatment was more likely than not the result of intentional discrimination when two different decisionmakers are involved. *See, e.g., Snipes*, 291 F.3d at 462-63. However, as this element is fact-intensive, the cases to which Defendant cites are

distinguishable. *See id.* (where there was a lack of commonality in supervisors among correctional officers disciplined at different time periods, district court's conclusion that the lack of commonality precluded an inference of discrimination was not unreasonable); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 667 (7th Cir. 2006) (finding employee failed to present sufficient evidence with respect to similarly situated element in part because he did not show he and his alleged comparable were fired by the same individual); *Timms v. Frank*, 953 F.2d 281, 287 (7th Cir. 1992) (employee not similarly situated with coworker where applications for reinstatement were considered by different people). As the Seventh Circuit instructs, this Court must determine whether distinctions between Plaintiff and the alleged comparable sufficiently account for any disparity in treatment. *Radue*, 219 F.3d at 618.

Here, given that Trout and Plaintiff shared the same shift with the same three to four supervisors, a material issue of fact exists as to whether distinctions within the group of supervisors sufficiently accounts for any disparity in treatment. Normally, the question of whether two employees are similarly situated is factual and therefore is resolved by the jury rather than the court. *U.S. E.E.O.C. v. Circuit City Stores, Inc.,* 2006 WL 1343173, at *8 (N.D. Ill. May 11, 2006). Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could conclude he and Trout were treated differently by the same group of supervisors in that Plaintiff signed up for training that was to be conducted in seniority order while Trout bypassed that policy and received training upon request. Ultimately, the fact finder may be persuaded that they are not similarly situated, but this Court cannot say a reasonable fact finder could not reach the opposite conclusion. *See, e.g, Hsieh*, 2006 U.S. Dist. LEXIS 86972 at *10.

In sum, Plaintiff has at minimum created a genuine issue of material fact as to each of the elements of his *prima facie* case. In response, Defendant has met its own burden of "produc[ing] admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 725 (7th Cir. 2005).

## C.    Pretext – Training and Certification Only

Defendant offers legitimate nondiscriminatory explanations for its actions. *See* DSSJ at 14; Def. Rep. at 10-11. Thus, Plaintiff must show Defendant's purported reasons are a pretext for discrimination or the decision was tainted by impermissible, race-based motives. Defendant contends he cannot make this showing, urging there are no material issues of fact. Plaintiff argues there are multiple material factual issues concerning pretext. This Court need only address reasons relevant to Plaintiff's discriminatory training and certification claims.

To demonstrate pretext, a plaintiff must show (a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on discriminatory intent. *Perez v. Ill.*, 488 F.3d 773, 778 (7th Cir. 2007). In the absence of direct evidence, the plaintiff must prove pretext indirectly. *Id.* With indirect evidence, the plaintiff must show the employer's reason is either not credible or is factually baseless. *Id.* "[The plaintiff] must also provide evidence of at least an inference that the real reason for the [adverse employment action] was discriminatory." *Id.* (quoting *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999)). To survive summary judgment, the plaintiff need only offer evidence that supports an inference that the employer's nondiscriminatory reason for its action was dishonest. *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006). A plaintiff can raise a genuine issue of fact about an employer's credibility by presenting evidence the explanation was contrary to the facts, insufficient to justify the action or not truly the employer's motivation. *Id.*

Plaintiff uses the indirect method. With respect to Plaintiff's claims of discriminatory training and certification, he presents evidence discussed above suggesting seniority governs the training process and the small group of supervisors on Plaintiff's shift contravened Defendant's policies as well as the CBA in training Trout, who is African-American and junior to Plaintiff. To be sure, a reasonable fact finder could find seniority was only among a host of factors the third shift supervisors considered in determining whom to train. However, summary judgment is appropriate only if a reasonable fact finder would be compelled to believe Defendant's explanation, and Plaintiff can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt. *Culver v. Gorman & Co.,* 416 F.3d 540, 547 -548 (7th Cir. 2005). Based on the record evidence, this Court cannot conclude a reasonable fact finder would be compelled to believe Defendant's explanation. That very kind of uncertainty, which at minimum would permit a reasonable trier of fact to reach different conclusions as to the credibility of Defendant's proffered rationales, is exactly what precludes summary judgment here. It would be reasonable for a jury to deem pretextual Defendant's explanations that it did not have formal process in which employees signed up to receive training based upon seniority but that it rather simply invited employees to initiate the training process. Of course, the ultimate fact finder will be entirely free to believe Defendant, and to find its explanations—and those of the small group of supervisors on Plaintiff's shift—are not pretextual. However, the factual challenges Plaintiff presents with respect to Defendant's explanations shows a reasonable fact finder would not necessarily be compelled to believe Defendant's explanation. Thus, this Court concludes the evidence, taken in the light most favorable to Plaintiff, creates a triable issue of fact on this issue.

In sum, this Court finds that when viewing the evidence in the light most favorable

to Plaintiff, a reasonable jury could return a verdict for him on the evidence presented as it relates to his race discrimination claim based upon the alleged discriminatory training and certification practices. As discussed above, none of Plaintiff's other claims regarding race discrimination survive summary judgment. As a matter of law, these claims do not support a *prima facie* case nor create a material issue of fact for the jury. Thus, this Court grants summary judgment on all of Plaintiff's race discrimination claims except for his claim regarding discriminatory training and certification. Because Plaintiff presents sufficient evidence to create a genuine issue of material fact regarding discriminatory training and certification, summary judgment on that single issue is denied and Plaintiff is entitled to proceed to trial upon the training and certification issue.

## C.    Retaliation

A plaintiff may prove retaliation either directly or indirectly. *Tomanovich*, 457 F.3d at 662-63. Under the direct method, a plaintiff may present either direct or circumstantial evidence to show he engaged in a protected activity (e.g., filing a charge of discrimination), consequently suffered an adverse employment action, and there was a causal connection between the two. *Id.* The indirect method requires the plaintiff to establish a *prima facie* case of retaliation by showing: (1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* If the plaintiff fails to satisfy any one element, it is fatal to his retaliation claim. *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its action. *Tomanovich*, 457 F.3d at 662-63. If the defendant makes such a showing, the plaintiff has the burden to prove the

defendant's reason is pretextual. *Id.*

### 1. *Prima Facie* Case – Indirect Method

Plaintiff uses the indirect method of proof. The parties again do not dispute Plaintiff meets the first two prongs of the four-part test—(1) he engaged in a statutorily protected activity by filing an IDHR charge; and (2) he met the employer's legitimate expectations. Therefore, this Court focuses on whether Plaintiff satisfies the third and fourth prongs.

### a. Adverse Employment Action

Defendant argues Plaintiff fails to identify the specific supervisor who retaliated against him and to show that particular supervisor was aware Plaintiff had filed an IDHR charge at the time of the retaliatory action. Moreover, Defendant asserts, it is undisputed Plaintiff was trained and certified on both the taylor and the crane after he filed his IDHR charge, which shows he was treated at least as favorably as his non-charge-filing coworkers and more favorably with respect to the crane since his name did not appear on the 2006 sign-up sheet. Plaintiff contends there are triable questions of fact regarding this issue.

Materially adverse actions for purposes of retaliation claims are not limited to employment-related activities but include any actions that are harmful to the point they could dissuade a reasonable employee from exercising his rights under Title VII. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008) (citing *Burlington Northern & Santa Fe Ry. v. White*, 568 U.S. 53 (2006)). It is "important to separate significant from trivial harms . . . [as] Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington*, 568 U.S. at 68. Courts must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788. Whether a job assignment is materially adverse depends upon the circumstances, and "should be judged from the

perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington*, 568 U.S. at 71. "Retaliation necessarily assumes knowledge of the predicate protected activity . . . [a]n employer cannot retaliate for something of which [it] does not know." *Frazier v. Am. Pharm. Ptrs, Inc.*, 2007 WL 4553045, at *8 (N.D. Ill. Dec. 20, 2007). "If decisionmakers are not aware of protected activity, such activity cannot be a cause or motive for discharge." *Id.*

While Plaintiff urges the activity must be viewed in the aggregate, he cites to two district court cases that are not binding precedent. *Thomas v. Habitat Co.*, 213 F.Supp.2d 887, 896-97 (N.D. Ill. 2002); *Stallings-Daniel v. Northern Trust Co.*, 2003 U.S. Dist. LEXIS 13296, at *47-49 (N.D. Ill. Jul. 31, 2003). Moreover, neither case demonstrates viewing the allegations in the aggregate is required. *See id.* Although *Thomas* cites to one Seventh Circuit opinion, in that case, the court examined whether an employee was transferred in retaliation for filing complaints and is therefore distinguishable. *Collins v. State of Ill.*, 830 F.2d 692, 704 (7th Cir. 1987). This Court will examine each of the eleven[14] allegations with context in mind; however, the Court will eliminate those that do not rise to the level of adverse employment actions even when viewed in totality. The Court categorizes the allegations for analytical purposes.

---

[14]Because Plaintiff presented only inadmissible evidence with respect to his claim Defendant wrongfully withheld an annual raise to which he was contractually entitled, the Court will not consider this allegation. Also, because Plaintiff's claim he was denied the amount of time for an investigation of a matter to which he is contractually entitled is not supported by the evidence, the Court will not consider this allegation.

### 1.      Job Assignments

Plaintiff claims he was continually assigned to perform ground work—which required him to seek medical attention in one instance—despite the availability of junior employees and the CBA's provision that seniority governs assignments.  Although there exist disputed issues of fact with respect to whether seniority governs assignments and whether Wendt, the supervisor who assigned him to perform ground work outside on a freezing night, knew Plaintiff had filed an IDHR charge, these are not material.  Plaintiff produces no evidence as to when he was assigned to work outside on a freezing night because he does not recall.  Significantly,  he admits employees can be asked to perform ground work at any time; assignments for all union employees are made on a day-to-day basis; and all employees of all job classifications were assigned all of the jobs about which he complains.  Thus, any factual dispute is not material.

Plaintiff also claims he was forced to train on and operate the taylor, which he alleges is an undesirable piece of machinery.  Plaintiff fails to demonstrate sufficient evidence that this is a materially adverse employment action for a number of reasons.  *See supra*, III.B.2.A.4. Plaintiff also fails to demonstrate sufficient evidence that his final claim with respect to job assignments—denial of an opportunity to work in Memphis—constituted a materially adverse employment action.  Not only does Plaintiff fail to identify which employees were allowed to work in Memphis and which supervisors were responsible for assigning employees to work there, he admits he never asked to work in Memphis.

The Court's conclusions with respect to these job assignments are not only supported by the evidence, but also by the case law in the Seventh Circuit.  This circuit has declined to find similar actions constitute adverse employment actions.  *See supra,* III.B.2.A.4.  In sum, Plaintiff fails to present sufficient evidence to show the allegedly retaliatory acts with respect

to job assignments constitute materially adverse employment actions. Summary judgment is granted with respect to these claims.

## 2. Training

Citing two of his responses to Defendant's Local Rule 56.1 Statement, Plaintiff claims he was "required to undergo far more extensive training to be an operator than non-complaining employees" in retaliation for filing his IDHR charge. Although there are disputed issues of fact with respect to this allegation, they are not material because Plaintiff fails to provide sufficient evidence that this claim rises to the level of an adverse employment action. To the contrary, the evidence and timeline of events shows Plaintiff was treated the same before and after he filed his charge. *See, e.g., Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 725 (7th Cir. 2001) (where there was "no ratcheting up of the harassment after the complaint was filed, the complaint could not have been the cause of the allegedly retaliatory conduct"); *Magiera v. Ford Motor Co.*, 1998 WL 704061, at *8 n.2 (N.D. Ill. Sept. 30, 1998) (where facts tended to prove employer treated employee exactly the same both before and after plaintiff filed his EEOC charge, a reasonable mind could not conclude the employer was retaliating against the plaintiff).

This allegation does not demonstrate retaliation, even when viewed in totality and in a light most favorable to Plaintiff, because Plaintiff signed up for and did not receive training on the crane before he filed his IDHR charge in April 2004. Viewing the evidence in a light most favorable to Plaintiff, he signed up for training in 2001, 2002, and again in March 2004. After he filed his charge, he received training on the crane beginning in June 2005 until October 2005, when training stopped; he finished his training when it resumed in November 2006; and he was certified on November 27, 2006, at which time he received the $1.50 wage increase to which he was entitled. Thus, Plaintiff's proffered evidence shows he was denied

54

training opportunities before he filed his charge. While Plaintiff's training was delayed after he filed his charge, he fails to present sufficient evidence to suggest he was treated worse after the filing or from which it is reasonable to infer his charge could have been the cause of the allegedly retaliatory conduct. Significantly, Plaintiff is the only employee on his or any shift to have been certified on the crane since late 2003. As discussed above, Plaintiff presents only inadmissible evidence that other employees were certified on the crane since late 2003. *See* PR ¶ 45 and Pl. Ex. B at ¶¶ 11-12. He was also the only employee who was trained and certified on the crane in 2006. Also as discussed above, Plaintiff admitted in his deposition testimony that he did not know whether anyone else was trained on the crane in 2006. *See* PR ¶ 42 and Pl. Ex. A at 58. Fourteen employees signed up to be trained on the crane in January 2006, six of whom were more senior than Plaintiff; eleven of whom are non-white; and none of whom have filed a charge of discrimination against Defendant. In sum, a reasonable mind could not conclude Defendant was retaliating against Plaintiff. Thus, the evidence shows Plaintiff's claim does not constitute an adverse employment action. Summary judgment is granted with respect to this claim.

### 3. Disciplinary Actions

Plaintiff claims multiple disciplinary actions were issued against him, which were ultimately resolved in his favor. *See* PR ¶¶ 93, 94, 97 and 99. However, the only evidence he cites in support of this statement references administrative assistant Walker as the alleged retaliator in two suspensions that were subsequently rescinded. While Walker's knowledge of Plaintiff's charge is disputed, viewing the evidence in the light most favorable to Plaintiff, Walker was aware of Plaintiff's IDHR charge as of September 2004.

There are disputed issues of fact regarding the two suspensions. This Court views both in a light most favorable to the Plaintiff. With respect to the first incident in July 2005, Walker issued Plaintiff a warning because Walker mistakenly classified Plaintiff's vacation

leave as an unauthorized absence. Plaintiff claims this caused him to be suspended one day; disputes whether Walker's mistake was honest; contends he spent two months grieving his suspension; and claims he suffered a loss of pay in that he did not receive a paycheck for two weeks as a result of the incorrect classification of his absence as unauthorized and because he did not receive his back pay during the two-month period in which he grieved the suspension. With respect to the second incident, Plaintiff was issued a suspension notice that was subsequently rescinded. Whether the suspension was warranted and whether Plaintiff actually served a one-day suspension are disputed. Plaintiff claims he called in sick to report an absence, but he fails to identify when he provided a doctor's note to Walker. He claims he had to file a grievance and waited one week for back pay for the date of the suspension.

Plaintiff relies upon *Flanagan v. Office of the Chief Judge of the Circuit Court of Cook County* to show heightened scrutiny alone is a materially adverse action. However, this case is readily distinguishable, as the *Flanagan* plaintiff was investigated several times by her supervisors, and her coworkers complained about being assigned to work with her because they were subjected to "more accusatory surveillance and interviews when they partnered" with the plaintiff. 2007 U.S. Dist. LEXIS, at *25-26 (7th Cir. 2007).

Moreover, key factors signify these two disciplinary actions do not constitute materially adverse employment actions, even when viewed in the aggregate and in a light most favorable to Plaintiff. Significantly, he admits other non-charge filing employees have been disciplined for the same reasons for which Plaintiff has been disciplined. Thus, he fails to show he was singled out or that these disciplinary actions were related to his charge. Moreover, Plaintiff's disciplinary history prior to the April 2004 filing of his IDHR charge is compelling. In the three-year period prior to Plaintiff's filing of his charge, he was disciplined on at least eight occasions—including a termination subsequently rescinded only

with union intervention—for infractions involving unsatisfactory work performance, attendance, safety violations, and causing an accident. Thus, the evidence tends to show he was treated the same before and after he filed his charge. *See, e.g., Johnson*, 260 F.3d at 725; *Magiera*, 1998 WL 704061 at *8 n.2. While three disciplinary actions were resolved in his favor through the grievance process, significantly, two of those were the disciplinary actions at issue here. Thus, only one disciplinary action issued before Plaintiff filed his charge was resolved in his favor through the grievance process, while two such actions were resolved in his favor after he filed his charge. In sum, although there exist disputed issues of fact regarding these disciplinary actions, they do not require a trial because Plaintiff does not provide sufficient evidence to show they constitute an adverse employment action. Summary judgment is granted with respect to these claims.

### 4. Alleged Comments and Hostility Toward Plaintiff

Plaintiff claims ATM Richard Jones announced to the workplace over the Company's two-way radio system in September 2004: "We don't want to discriminate against John Malozienc's chances of training on the taylor." PR ¶ 70. Plaintiff asserts Jones made this statement to retaliate against Plaintiff for filing his charge and he was never reprimanded or disciplined. Plaintiff attempts to rely on two cases to show this single comment rises to the level of an adverse employment action. However, both of these cases are readily distinguishable and neither of these cases shows a single comment, without more, rises to the level of an adverse employment action. In the first case, *Owens-Floyd v. City of Chicago*, the court found the plaintiff's retaliation claim survived summary judgment under the direct method based upon a combination of actions her direct supervisor took against her. 2007 WL 4365324, at *4-5 (N.D. Ill. Dec. 11, 2007). The court viewed the "strongest piece of

evidence" was suspicious timing in that "barely two months" after the plaintiff filed her charge of discrimination, she was transferred to another location. *Id.* This transfer forced her to commute an extra hour every day, which was significant because the plaintiff believed her son was being recruited by a gang and worried about being farther away from him. *Id.* at *2, 4-5. Thus, the circumstances surrounding the transfer prompted the court to conclude a reasonable jury could find the transfer constituted an adverse employment action. *Id.* The court focused on a confrontation between the plaintiff and her direct supervisor in addition to the transfer. *Id.* During this confrontation, the supervisor not only asked her why she did not stop filing charges but also told her to stop doing so. *Id.* Thus, the court relied upon both pieces of evidence to conclude a jury could find the supervisor unlawfully took action against her. *Id.*

The second case, *Flanagan*, is also distinguishable. In that case, the court employed the direct method to find the plaintiff's evidence supported the jury's verdict and the retaliation claim survived defendant's renewed motion for judgment as a matter of law. 2007 U.S. Dist. LEXIS 75208 at *3, 21, 45. The court found the chief probation officer's ("CPO") series of comments to the plaintiff demonstrated hostility toward the plaintiff "in the highest echelons" of the office. *Id.* at *39-40. First, the CPO publicly reprimanded the plaintiff, telling her "if [the plaintiff] did not like what [the CPO] was telling her, that she needed to find her a new job." *Id.* at *6. A witness testified "[e]verybody reacted to" the reprimand, as some were "laughing and others [were] just astounded." *Id.* The CPO held a meeting with the plaintiff and her direct supervisor at which she told the plaintiff "she couldn't stand her." *Id.* at 39-40. Subsequently, a new CPO told the plaintiff "he had heard about [her], didn't need to see her, and was done with her." *Id.* This altercation occurred in front of many co-workers, who laughed at the plaintiff. *Id.*

Here, in contrast to the confrontations in *Flanagan* and *Owens-Floyd*, Jones' comment does not rise to the level of an adverse employment action. Plaintiff presents no evidence that others reacted to Jones' comment. Thus, it is not reasonable to infer Jones' comment generated hostility toward Plaintiff. Plaintiff also fails to show a reasonable employee would have found the challenged action materially adverse. Further, Jones' comment is isolated and is not linked to any incidents in which he took action against Plaintiff or treated other employees more favorably. *Cf. Phelan*, 463 F.3d at 788 (employing direct method to conclude jury could find plaintiff's termination was an unlawful act of retaliation where the record was replete with warnings of various employees that she would experience adverse consequences if she continued to complain about sexual harassment, and her immediate supervisor attempted to discourage her from complaining about harassment, failed to report her final complaints to human resources, threatened to terminate her if she continued to complain, and subsequently terminated her).

Plaintiff does not cite to any case in which a court found a single comment rises to the level of an adverse employment action, and this Court finds no reason to conclude the one stray comment at issue here is actionable. *See Breneisen*, 512 F.3d at 981 (supervisor's comment alone was not sufficient to dissuade person from taking FMLA leave where supervisor told plaintiff that if he had a full staff he could get some work done and was not even a materially adverse action when coupled with same supervisor's conduct of marking plaintiff's FMLA leave as unexcused). Moreover, Supreme Court precedent supports this Court's decision. It is "important to separate significant from trivial harms . . . [as] Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington*, 568 U.S. at 68. Courts must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional

teasing.'" *Faragher*, 524 U.S. at 788. Here, Plaintiff fails to show a link between Jones' stray comment and any specific, materially adverse employment actions taken against him by Jones after he filed his charge. Plaintiff also fails to point to specific and material ways in which Jones acted in favor of others after Plaintiff filed his charge. Thus, any disputed issues of fact regarding Jones' comment do not require a trial because Plaintiff does not provide sufficient evidence to show they rise to the level of an adverse employment action. Even when viewing Plaintiff's claims in the aggregate, the circumstances fail to show a pattern of antagonism sufficient to demonstrate Defendant's conduct was retaliatory. Plaintiff does not show he was treated worse than he was before he filed his charge, as one comment amidst a backdrop of isolated incidents does not rise to the level of an adverse employment action.

Plaintiff also claims there exist genuine issues of material fact with respect to whether his subjection to allegedly "continued abuse by co-workers over the radio regarding the times plaintiff soiled himself" constitutes an adverse employment action. Plaintiff cites to only one case, *Washington,* to support his argument that management actively encouraged the exploitation of his vulnerability by failing to address the wrongdoing. 420 F.3d at 662-63. However, that case is readily distinguishable. In *Washington*, the court concluded a jury could find an adverse employment action where the employer abolished the plaintiff's position, assigned her to a new position under a new supervisor, and required her to work different hours and reapply for a flex-time schedule. *Id.* The court emphasized those actions "would be harmless to most people," but were actionable in the plaintiff's situation. *Id.* Specifically, changing her hours to 9:00 a.m. to 5:00 p.m. effectively decreased the plaintiff's wages by 25 percent because the employer knew she needed to leave work by 3:00 p.m. to care for her ill child. *Id.* The changes forced the plaintiff to use leave for two hours per day,

which reduced her salary because she used all of her vacation and sick leave. *Id.* For five months, the plaintiff's pay "fell to zero" until she found a supervisor willing to allow her to leave at 3:00 p.m. *Id.* Moreover, by making these changes, the employer exploited the plaintiff's known vulnerability because the employer was aware of her need to care for her ill child. *Id.* The court concluded a jury could find these actions caused a significant and therefore actionable loss. *Id.*

Here, Plaintiff's claims stand in stark contrast to the sudden changes and significant losses to which the plaintiff was subjected in *Washington.* In this case, the evidence shows radio misuse was not a sudden change. Instead, this conduct occurred before and after Plaintiff filed his charge. Thus, there is no evidence Plaintiff's charge triggered the radio misuse. Plaintiff does not know whether supervisors engaged in this behavior, and he also offers generalized and inconsistent testimony regarding the frequency of the radio misuse. *See* Pl. Ex. A at 84-85, 107-108, 115-117. Even assuming the radio misuse increased in frequency after Plaintiff filed his charge, however, the conduct still does not rise to the level of an adverse employment action, as Plaintiff testified the conduct occurred "only a few times before [he filed his charge] and it increased by about 100 percent after." Pl. Ex. A at 85. Even viewed in a light most favorable to Plaintiff, the conduct constitutes the type of complaint courts must "filter out" because it is akin to "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788.

Even more significantly, Plaintiff also fails to show Defendant treated the issue of radio misuse differently before and after Plaintiff filed his charge. To the contrary, Plaintiff complains Defendant failed to discipline or reprimand individuals with regard to this incident both before and after he filed his charge. *See e.g., Magiera*, 1998 WL 704061 at

*8 n.2. While Plaintiff alleges Jones never made an effort to address the teasing directed at him over the radio, he fails to state when Jones addressed radio misuse in general. *See* Pl. Ex. B at ¶¶ 29-30. Thus, Plaintiff fails to present evidence that Defendant treated other employees more favorably after he filed his charge.

Even when viewed in the totality of the circumstances, this claim fails to rise to the level of an adverse employment action. To be sure, it is undisputed that no employee was ever reprimanded with regard to this conduct, and that Defendant had a policy regarding radio safety. Significantly, however, misuse of the radio was common in the workplace; other employees were also the targets of radio misuse; and Defendant failed to take action. *See* Pl. Ex. A at 119. Plaintiff fails to show the radio misuse was harmful to the point it could dissuade a reasonable employee from exercising his rights under Title VII. *Breneisen*, 512 F.3d at 979 (citing *Burlington*, 568 U.S. 53); *see also* Pl. Ex. A at 119. Instead, the radio misuse is akin to a "trivial harm" that is not actionable because "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington*, 568 U.S. at 68; see also *Faragher*, 524 U.S. at 788. In sum, any disputed issues of fact regarding whether it was possible to reprimand employees for the radio misuse are not material because, even when viewed in a light most favorable to Plaintiff, this conduct does not constitute an adverse employment action.

Likewise, the Court finds the two remaining incidents within this category of comments toward Plaintiff also fail to support his retaliation claim. First, Plaintiff claims supervisor Darryl Delaney told employees no one would be able to "use their seniority to bump into a truck anymore." PSAF ¶ 18. While Plaintiff alleges this occurred after he filed his IDHR, he fails to show Delaney blamed Plaintiff. Thus, this comment does not rise to the level of an expression of hostility that could constitute a materially adverse employment

action in that Plaintiff fails to show he was singled out. Second, while Plaintiff claims Tolchin, a Caucasian, threatened Plaintiff, his claim that this demonstrates retaliation is unsupported by the evidence in that he fails to show this occurred after he filed his charge. PSAF ¶ 19. At best, Plaintiff was uncertain in his deposition testimony regarding when this event occurred, in which case he fails to show it was after the filing of his charge. Pl. Ex. A at 156. At worst, when the event was put in context with respect to the timing of a July 2005 incident, he agreed this event occurred in February 2004, before he filed his charge. *Id.*

In sum, the evidence Plaintiff offers regarding his retaliation claims tells a story of isolated, sporadic incidents, none of which rise to the level of an adverse employment action, even when viewed in the aggregate. The actions about which Plaintiff complains do not constitute unlawful retaliation, much less an ongoing campaign of retaliation. Therefore, this Court finds that even when viewing the evidence in the light most favorable to Plaintiff, he did not suffer an adverse employment action as a matter of law and any disputed issues of fact are not material. Moreover, none of the above-alleged acts of discrimination have the necessary support to establish that they were materially adverse. Thus, because Plaintiff fails to create a genuine issue of material fact regarding this essential element of his *prima facie* case, his retaliation claim fails as he is unable to create a general issue of material fact as to all elements. *Hsieh*, 2006 U.S. Dist. LEXIS 89672, at *10. As such, it is unnecessary for this Court to determine whether Plaintiff was treated differently from a similarly situated employee. *See, e.g., Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 462-63 (7th Cir. 2007); *Hudson*, 375 F.3d 560 ("If the plaintiff fails to satisfy any one element, it is fatal to his retaliation claim."). Summary judgment is therefore granted with respect to his retaliation claim.

**D.      Timeliness Issue**

This Court adopts the factual and legal discussion set forth in its August 19, 2008 Opinion. *Malozienc v. Pacific Rail Services*, 572 F. Supp. 2d 939 (N.D. Ill. 2008) (Dkt. 100). Defendant argues summary judgment in its favor is appropriate because Plaintiff failed to file his Complaint within ninety days of the date that he received the EEOC's March 22, 2005 Right to Sue Notice ("Notice"). In so doing, Defendant revives the two arguments it advanced in its initial motion for summary judgment on the timeliness issue. In response, Plaintiff asserts there remains a genuine issue of material fact concerning whether his lawsuit was timely filed. Plaintiff also argues that, in the alternative, equitable tolling should be applied.

Defendant first contends that, in light of the December 17, 2004 document, it is "now clear that Plaintiff specifically and unequivocally requested that Notice in writing." DMSSM, at 2. Accordingly, Defendant argues, the EEOC lacked authority to revoke the Notice because the regulations governing the EEOC forbid the agency from revoking a right-to-sue notice where it has been requested by the Charging Party in writing. Therefore, Defendant asserts that the ninety-day limitations period never stopped running. With respect to this argument, the Court incorporates and adopts its prior ruling because the December 17, 2004 document does not change the Court's August 19, 2008 Opinion.

Indeed, the document itself is not substantially different from the testimonial evidence Plaintiff previously provided when Defendant's initial motion for summary judgment was filed. According to Plaintiff's account, he informed the IDHR he wanted his case transferred

to the EEOC, but a procedural error was made in response to his request to transfer the investigation of his charge to the EEOC. Viewed in a light most favorable to Plaintiff, the record before the Court demonstrates Plaintiff sought assistance from two government agencies, diligently followed their instructions, and did not really request a right-to-sue letter. He also took prompt action to assert this point upon receiving the letter. Significantly, the EEOC itself, it its May 16, 2005 rescission letter, recognized Plaintiff did not make such a request. Pl. Supp. Ex. 1.B.

Moreover, the discovery of the December 17, 2004 document supports this Court's conclusion that Plaintiff did not really request a right-to-sue letter, as that document was one of the two forms he returned to the IDHR pursuant to the IDHR's instructions. The second form was the November 4, 2004 Voluntary Withdrawal Request Form. Pl. Supp. Ex. 6, Pl. Dep. Ex. 17. As discussed above, the IDHR investigator told Plaintiff he would send him the necessary paperwork to transfer the claim to the EEOC. One of these forms was provided to Plaintiff in error, as the IDHR investigator told Plaintiff he was uncertain as to which forms the IDHR had previously sent Plaintiff in response to his request to transfer the investigation. When he returned the two forms to the IDHR, Plaintiff knew that one of the forms would not operate to transfer his charge from the EEOC. However, Plaintiff testified that he returned both documents simultaneously because the IDHR representative had expressed confusion regarding which documents the IDHR had sent to Plaintiff in response to his request. In the interest of avoiding further delay of the transfer of the investigation of his charge from the IDHR to the EEOC by returning only the incorrect form, he sent both

forms. Plaintiff presents evidence that he did not understand the function of a right-to-sue-notice at the time he returned the forms to the IDHR. Viewing the evidence in a light most favorable to Plaintiff, he did not really request a right-to-sue notice. In the alternative, this presents a genuine issue of material fact appropriate for resolution by a jury, as a jury could find that although Plaintiff received the First Right to Sue letter, he did not really request such a letter.

Defendant also argues Plaintiff is bound by contract by his written request for a right-to- sue notice. While Defendant recognizes the Court previously rejected Defendant's contract argument, Defendant asserts the December 17, 2004 document warrants a reversal of the August 19, 2008 Opinion. This Court disagrees and therefore incorporates and adopts its prior ruling with respect to Defendant's contract argument, which replicates arguments Defendant previously made.

Viewed in a light most favorable to Plaintiff, the record before the Court demonstrates Plaintiff, who was proceeding *pro se*, diligently followed the instructions of a government agency, acted quickly to correct the mistake, and reasonably relied on the EEOC's letter of rescission. Therefore, in light of the circumstances of this case, even though Plaintiff admitted he thoroughly read the December 17, 2004 document before signing it and did not inquire as to its meaning, Defendant's contract argument is rejected at this time. Plaintiff testified that the IDHR investigator expressly instructed him to return the documents he had received. It was reasonable to rely upon the IDHR's representations that the agency would process the paperwork to effectuate Plaintiff's request to transfer the investigation of his

charge. Moreover, the EEOC continued to investigate Plaintiff's charge. Accordingly, Plaintiff's Second Right to Sue Notice is valid, rendering Plaintiff's December 13, 2005 filing timely, as it occurred within the ninety-day limitations period. Therefore, Defendant's supplemental motion for summary judgment as to the timeliness issue is denied.

Even if this Court found Plaintiff should have filed his complaint within ninety days of his receipt of the Original Notice, a fact question exists as to whether the doctrine of equitable tolling would be applicable, which tolls the ninety-day limitation period to file a lawsuit following the receipt of a right-to-sue notice. *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 850 (7th Cir. 2001). The equitable tolling doctrine "deals with situations in which timely filing is not possible despite diligent conduct." *Farzana K. v. Indiana Dep't of Educ.*, 473 F.3d 703, 705 (7th Cir. 2007). Equitable tolling is "reserved or situations in which the claimant 'has made a good faith error . . . or has been prevented in some extraordinary way from filing his complaint in time.'" *Threadgill*, 269 F.3d at 850 (quoting *Jones v. Madison Service Corp.*, 744 F.2d 1309, 1314 (7th Cir. 1984)). *See also Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984) (suggesting that tolling is appropriate where the plaintiff is misled by the defendant, improperly notified of his rights, led by the court to believe that the plaintiff had done everything required of her, or where a motion to appoint counsel is pending).

Plaintiff argues equitable tolling excuses his delay in the event the Court deems his filing was untimely. Plaintiff has raised a question of fact on this issue. In its August 19, 2008 Opinion, this Court expressed its willingness to consider the doctrine of equitable

tolling, if appropriate. Viewing the facts in a light most favorable to Plaintiff, this Court finds Plaintiff has raised a question of fact as to whether it is appropriate to invoke the doctrine of equitable tolling. Specifically, in light of the factual account discussed above, a fact issue exists as to whether Plaintiff made a good faith error based upon the inconsistent information the EEOC and the IDHR provided to him.

Plaintiff argues the instant case is analogous to *Ross v. Deffenbaugh Industries, Inc.;* this Court finds that case instructive. 2006 WL 148995 (D. Neb. Jan. 18, 2006). In *Ross*, an employee of the Nebraska Equal Opportunity Commission ("NEOC") advised the plaintiff to request a right-to-sue letter, which he requested and obtained. *Id.* at *1. Subsequently, the EEOC District Director issued a "Notice of Intent to Reconsider." *Id.* After additional investigation, the EEOC issued a "Dismissal and Notice of Rights," again advising the plaintiff he could file suit within ninety days. *Id.* The plaintiff did so. *Id.* When the defendant challenged the timeliness of his filing on grounds that the EEOC lacked authority to issue the notice of intent to reconsider, the plaintiff argued the ninety-day period fo filing should be equitably tolled. *Id.* at *3. In applying the doctrine and allowing the plaintiff to proceed with his action, the *Ross* court found persuasive the plaintiff's arguments that he was unrepresented by counsel and did not understand the meaning of the initial right-to-sue letter. *Id.* The court emphasized as "troubling" the issue of whether the plaintiff was led to believe he had done everything required of him, finding that while "no *court* led [him] to believe that he had done everything required of him, the EEOC and NEOC clearly *did* lead [him] to believe that he had done everything required of him." *Id.* at *4 (emphasis in

original).

In this case, Plaintiff presents similar evidence sufficient to create a genuine issue of material fact regarding whether misleading administrative agency action renders it appropriate to invoke the doctrine of equitable tolling. *Threadgill*, 269 F.3d at 850 (noting "[t]he courts have allowed equitable tolling where the claimant 'has *actively* pursued his judicial remedies'") (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).

Moreover, a fact finder could conclude that Plaintiff reasonably relied on the IDHR investigator's instructions as well as the subsequent May 16, 2005 rescission letter from the EEOC District Director. In addition, Plaintiff presents evidence sufficient to create a genuine issue of material fact regarding whether the instructions he received misled him such that he believed he had done everything required of him. *See, e.g., Sitarski v. IBM Corp.*, 708 F. Supp. 889, 891 (N.D. Ill. 1989) (noting that "in certain egregious cases, the limitation period will be equitably tolled if administrative action induced detrimental reliance by a plaintiff"). All of these considerations support this Court's finding that it should consider the merits of Plaintiff's claims. *See Campbell v. Runyon*, 1994 WL 329744, at *3 (N.D. Ill. July 7, 1994) (finding plaintiffs raised a question of fact as to whether they were misinformed by the EEOC counselor as to the procedures required to preserve their claims and reasoning "[e]quitable considerations compel the conclusion that error by EEO officers ought not redound to the plaintiffs' detriment").

In sum, Defendant's supplemental motion for summary judgment as to the timeliness issue is denied.

## IV. CONCLUSION

For the reasons set forth in this opinion, Defendant's motion for summary judgment on the merits is denied in part and granted in part and Defendant's supplemental motion for summary judgment as to the timeliness issue is denied. With respect to Plaintiff's race discrimination claim, the Court denies summary judgment only as to the issue of discriminatory training and certification, but grants summary judgment in favor of Defendant on all remaining issues. The Court grants Defendant summary judgment on Plaintiff's retaliation claim.

SO ORDERED THIS 20th DAY OF MARCH, 2009

_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**
Alisa B. Arnoff
Gregg J. Simon
Scalambrino & Arnoff, LLP
One North LaSalle Street
Suite 1600

Chicago, IL 60602

Counsel for Plaintiff


Clifford R. Perry III
Devlin Joseph Schoop
Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd.
515 North State Street
Suite 2800
Chicago, Il 60610

Counsel for Defendant